**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**

KALSHIEX LLC,

Plaintiff,

vs.

LIZ MURRILL, in her official capacity as Attorney General of Louisiana; DAWN HIMEL, in her official capacity as Director of the Louisiana Attorney General Office's Gaming Division; JEFF LANDRY, in his official capacity as Governor of Louisiana; LOUISIANA GAMING CONTROL BOARD; CHRISTOPHER B. HEBERT, in his official capacity as Chairperson of the Louisiana Gaming Control Board; KATHRYN W. BECNEL, in her official capacity as a member of the Louisiana Gaming Control Board; CLAUDE D. JACKSON, in his official capacity as a member of the Louisiana Gaming Control Board; MIQUELL M. HENNIGAN, in her official capacity as a member of the Louisiana Gaming Control Board; NICHOLAS J. LANGLEY, in his official capacity as a member of the Louisiana Gaming Control Board; JULIE A. LEWIS, in her official capacity as a member of the Louisiana Gaming Control Board; ROBERT L. WYATT, in his official capacity as a member of the Louisiana Gaming Control Board; RONALD J. SHOLES, in his official capacity as a member of the Louisiana Gaming Control Board; ASHLEY ANDERSON TRAYLOR, in her official capacity as a member of the Louisiana Gaming Control Board; LOUISIANA STATE POLICE, GAMING ENFORCEMENT DIVISION; ROBERT PAUL HODGES, in his official capacity as Superintendent of the Louisiana State Police and ex-officio member of the Louisiana Gaming Control Board; and JARROD J. CONIGLIO, in his official capacity as Secretary of the Louisiana

Case No.

COMPLAINT FOR PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

Department of Revenue and ex-officio member of the Louisiana Gaming Control Board,

Defendants.

## INTRODUCTION

1. This action challenges the State of Louisiana's clear intention to violate the Supremacy Clause with respect to the regulation of event contracts. The federal Commodity Exchange Act ("CEA") grants the Commodity Futures Trading Commission ("CFTC") "exclusive jurisdiction" over event contracts when they are "traded or executed on a contract market" that has been federally "designated" for that purpose. 7 U.S.C. § 2(a)(1)(A). Plaintiff KalshiEX LLC ("Plaintiff" or "Kalshi") operates a federally designated contract market ("DCM") on which the CFTC has permitted it to trade sports event contracts.

2. But Louisiana has taken a different view, and Kalshi believes it will imminently bring an enforcement action with the intent to bar Kalshi from offering event contracts. Defendants have repeatedly made clear that they believe event contracts like Kalshi's are illegal under Louisiana's gambling laws. The Louisiana Gaming Control Board (the "Board") has formally declared that such contracts are illegal gambling even when listed on a CFTC-regulated exchange, and that it "sees no defense to offering such activity pursuant to a CFTC license." Ex. 1 at 2. The Board's Chairman, Defendant Hebert, has said the State is "actively seeking ways to stop this." Ex. 2 at 5. Defendant Attorney General Murrill has called prediction markets "gambling" and vowed to "make sure that our laws are respected and enforced." *Id.* at 15. And Attorney General

Murrill has signed multiple amicus briefs in federal courts of appeals arguing that Kalshi's contracts violate state gambling laws.[1]

3. Louisiana law makes it a crime to conduct, as a business, any "game, contest, lottery, or contrivance whereby a person risks the loss of anything of value in order to realize a profit," and separately criminalizes "gambling by computer," meaning the same conduct carried out over the internet. La. Stat. Ann. §§ 14:90(A)(1)(a), 14:90.3(B). Sports wagering is exempt from those prohibitions only if it is "conducted in compliance with" Louisiana's sports-wagering laws. La. Stat. Ann. § 14:90(E). Those laws, in turn, prohibit anyone from operating a "sports book" "without first being licensed by the board." La. Stat. Ann. § 27:604(A)(1). They define a "sports wager" as "a sum of money or representation of value risked by a player on an occurrence associated with a sports event for which the outcome is uncertain," and expressly include "exchange wagering," and define "sports wagering" as the acceptance of such wagers "by any system or method of wagering." *Id.* § 27:602(24); La. Stat. Ann. § 27:602(23), (24). Defendants have made clear that they read those provisions to treat Kalshi's federally regulated event contracts as unlicensed gambling by computer, despite the statute's express provision that "[n]othing in this Section shall prohibit, limit, or otherwise restrict the purchase, sale, exchange, or other transaction related to stocks, bonds, futures, options, commodities, or other similar instruments or transactions occurring on a stock or commodities exchange, brokerage house, or similar entity." La. Stat. Ann. § 14:90.3(M).

4. The consequences are severe. A violation carries fines of up to $100,000 and up to five years' imprisonment, with or without hard labor. La. Stat. Ann. § 14:90.3(E). Each wager

---

[1] *See generally* Br. of Amici Curiae, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. June 17, 2025), Dkt. No. 29; Br. of Amici Curiae, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Dec. 22, 2025), Dkt. No. 41; Br. of Amici Curiae, *KalshiEX LLC v. Assad*, No. 25-7516 (9th Cir. Jan. 30, 2026), Dkt. No. 48.1.

counts as a separate violation, and forfeiture of profits and gross receipts is mandatory. La. Stat. Ann. § 14:90.3(E), (I), (J). Property and money are subject to civil forfeiture "notwithstanding whether a conviction has been procured." La. Stat. Ann. § 14:90.1(B)(1).

5. Under enforcement tools that took effect on August 1, 2026, the Attorney General may sue to restrain such conduct by temporary or permanent injunction. La. Stat. Ann. § 27:19.1(A), (G). On the Attorney General's application, "regardless of whether proceedings have been initiated," courts may order the removal of websites and the freezing of associated bank and credit accounts, including through ex parte injunctions, and in such actions a violation "shall conclusively be determined irreparable harm." *Id.* § 27:19.2(A)–(B). These laws also expose platform providers, geolocation providers, media affiliates, and payment processors to criminal penalties. La. Stat. Ann. § 14:90.3(F)–(H).

6. Louisiana's threat to prohibit Kalshi from operating is a form of regulation that intrudes on the federal scheme. The Supremacy Clause does not tolerate that result. Ceasing operations would place Kalshi in tension with, and could jeopardize its compliance with, the CFTC's impartial access requirement, which requires a DCM to provide its members and other eligible participants with impartial access to its markets and services, among other things. 17 C.F.R. § 38.151(b). Indeed, the CFTC has already filed suit in many courts seeking injunctive relief against other states' unconstitutional attempts to circumvent federal law and impose their own regulations on DCMs.[2] And the alternative—that Kalshi obtain a license—presents a demand

[2] *See* Complaints filed at Dkt. No. 1 in *United States v. Arizona*, No. 26-cv-2246 (D. Ariz. Apr. 2, 2026); *United States v. Connecticut*, No. 26-cv-498 (D. Conn. Apr. 2, 2026); *United States v. Illinois*, No. 26-cv-3659 (N.D. Ill. Apr. 2, 2026); *United States v. New York*, No. 26-cv-3404 (S.D.N.Y. Apr. 24, 2026) ("CFTC N.Y. Compl."); *United States v. Wisconsin*, No. 26-cv-749 (E.D. Wis. Apr. 28, 2026); *United States v. Minnesota*, No. 26-cv-2661 (D. Minn. May 19, 2026); *United States v. New Mexico*, No. 26-cv-1912 (D.N.M. June 12, 2026); *United States v. Kentucky*, No. 26-cv-49 (E.D. Ky. June 23, 2026); and Intervenor Compl., *KalshiEX LLC v. Furcolo*, No. 26-cv-327 (D.R.I. June 26, 2026), Dkt. No. 37 (collectively, the "CFTC Complaints").

Kalshi cannot satisfy, as explained below. *See infra* ¶ 9. As such, Kalshi faces an imminent risk that Defendants will attempt to enforce Louisiana's preempted state laws against it.

7. Plaintiff Kalshi seeks injunctive and declaratory relief to prevent Louisiana officials from enforcing La. Stat. Ann. §§ 14:90, 14:90.1, 14:90.3, 27:19.1, 27:19.2, 27:604, and 51:1405(A), or any of Louisiana's other state gambling or sports-wagering laws against Kalshi based on its operation of a federally regulated DCM.

8. The merits of Kalshi's preemption claim are plain. The CEA grants the CFTC "exclusive jurisdiction" over instruments, including "swaps," traded on DCMs. 7 U.S.C. § 2(a)(1)(A). The CEA then provides that "swaps" include event contracts, defining the term "swap" to cover a "contract" for a "payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). The CEA also expressly grants the CFTC—*and only the CFTC*—the power to bar "event contracts" involving "gaming" from DCMs if the CFTC determines that trading in those contracts is not in the "public interest." *Id.* § 7a-2(c)(5)(C). Using that delegated authority, the CFTC recently promulgated a Notice of Proposed Rulemaking ("NPRM") that sets out a detailed federal framework regulating the trading of sports event contracts on DCMs, which is expected to be final within the next two months. Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (proposed June 12, 2026) (to be codified at 17 C.F.R. pt. 40); Fed. Pls.' Resp. to Defs.-Appellants' Mot. for Summ. Disposition at 2, *CFTC v. Johnson*, No. 26-4281 (9th Cir. Sep. 24, 2026), Dkt. No. 29.1. And exercising its express statutory authority to further define the term "swap," 15 U.S.C. § 8302(d)(1), the CFTC has since issued an Interim Final Rule, effective immediately, excluding from the "swap" definition casino-style gambling products that are regulated under state law and not traded

on an organized exchange,[3] and proposed a rule defining "swaps" to include "[e]vent contracts, including those based on sports-[related] … events."[4] Elsewhere in the federal code, Congress has made clear that transactions executed on DCMs are *not* bets or wagers. *See* 31 U.S.C. § 5362(1)(E)(ii) (providing that the term "bet or wager" "does not include" transactions conducted on "a registered entity . . . under the Commodity Exchange Act").

9. Louisiana's threat to prohibit Kalshi from operating contravenes all these Congressional commands. It asserts state jurisdiction over event contracts traded on DCMs, and it would subject sports event contracts to state regulatory requirements that squarely conflict with the federal ones. In Defendants' view, Kalshi may not offer sports event contracts in Louisiana unless the State grants it a license, but Kalshi could not operate within Louisiana's licensing regime. Louisiana law requires licensed operators to comply with a host of state-specific restrictions. Wagers must be "initiated, received, and otherwise made within the state unless otherwise determined by the board." *Id.* § 27:607(F). No wager may be placed "when the player is physically located out of state or in a parish that has not approved a proposition authorizing sports wagering." *Id.* § 27:609(C)(2)(b); *see also Id.* § 27:608(A). And "[a]ll servers responsible for the processing of sports wagers shall be physically located in Louisiana." *Id.* § 27:605(G). Complying with these state-specific requirements is impossible to reconcile with the CEA. The alternative, ceasing to offer sport event contracts in Louisiana, would bring Kalshi ***out*** of compliance with federal law, as the CFTC's long-standing regulations—implemented to protect the same users Louisiana is now claiming remain vulnerable—require DCMs to provide "impartial access" to their markets and prevent "market disruptions." 17 C.F.R. §§ 38.151(b), 38.255.

[3] Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65,969, 65,971, 65,979 (Oct. 19, 2026).
[4] Further Definition of "Swap" – Inclusions, 91 Fed. Reg. 66,022, 66,031 (proposed Oct. 19, 2026) (to be codified at 17 C.F.R. pt. 1).

10. In short, Defendants' threatened enforcement of Louisiana law is preempted several times over. Applying Louisiana's gambling and sports-wagering laws to Kalshi's exchange would expressly violate the CEA's "exclusive jurisdiction" provision by asserting concurrent state jurisdiction over sports event contracts traded on federally regulated DCMs. It would intrude on the field of exchange-traded derivatives that Congress has reserved entirely for the federal government. And it would force Kalshi to choose between violating federal law and facing criminal prosecution, forfeiture, and civil enforcement under state law.

11. Multiple courts have recognized that analogous state efforts to regulate event contracts traded on a DCM under state gaming statutes are flatly preempted. For example, the Third Circuit upheld a district court's determination that Kalshi is entitled to a preliminary injunction against New Jersey's efforts to enforce its gaming laws against Kalshi, explaining that, because "Congress gave the CFTC exclusive jurisdiction over trades on DCMs," the CEA "preempts [state] law from reaching into Kalshi's CFTC-licensed DCM." *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 231 (3d Cir. 2026). The Ninth Circuit agreed that the CEA "expressly preempts state law regulating swaps 'traded or executed on' a DCM." *KalshiEX LLC v. Assad*, --- F.4th ----, No. 25-7516, 2026 WL 2543846, at *7, *15 (9th Cir. Aug. 28, 2026) (agreeing that the CEA preempts state regulation of swaps traded or executed on a DCM, but holding that Kalshi's sports-event contracts were likely not swaps); *but see KalshiEX LLC v. Schuler*, --- F.4th ----, Nos. 26-3196, 26-5235, 2026 WL 2884087 (6th Cir. Sept. 25, 2026) (holding Kalshi's event contracts are not swaps and the CEA does not preempt Ohio or Tennessee gambling laws). District courts in Arizona and Minnesota reached the same conclusion in issuing preliminary injunctions, barring officials in each state from enforcing state laws against Kalshi and other similar exchanges for offering event contracts in those states. *See, e.g.*, *KalshiEX LLC v. Johnson*, 832 F. Supp. 3d

964 (D. Ariz. 2026); *United States v. Minnesota*, No. 0:26-cv-2661, 2026 WL 2150211 (D. Minn. July 27, 2026). Other courts have agreed. *See Flaherty*, 2025 WL 1218313, at *6 (holding "Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction" and "at the very least field preemption applies"); Order on Plaintiffs' Motions for Preliminary Injunction, *KalshiEX LLC v. Ellison*, No. 26-cv-2778 (D. Minn. July 27, 2026) (preliminarily enjoining enforcement of Minnesota's prediction market statute where CEA's grant of "exclusive jurisdiction" to the CFTC reflects congressional intent to displace state authority over transactions on DCMs). And earlier this month, the Northern District of Illinois preliminarily enjoined Illinois officials from enforcing that State's gambling laws against Kalshi, holding that Kalshi's contracts are swaps under the CEA's plain text and that state law is preempted because "Illinois attempts to regulate how Kalshi's swaps can be structured and what sorts of sporting events they can relate to." *Coinbase Fin. Mkts., Inc. v. Raoul*, No. 1:25-cv-15406, 2026 WL 2969682, at *6-7, *14-15 (N.D. Ill. Oct. 2, 2026).[5]

12. Kalshi is similarly entitled to a preliminary injunction barring Louisiana from enforcing La. Stat. Ann. §§ 14:90, 14:90.1, 14:90.3, 27:19.1, 27:19.2, and 27:604, or any other state gambling laws against it. By threatening enforcement, Louisiana has taken an extraordinary step in challenging the CFTC's exclusive jurisdiction to regulate DCMs pursuant to the CEA. Louisiana apparently deems itself unencumbered by the Supremacy Clause and federal law such

[5] While some district courts have denied preliminary relief to Kalshi, Kalshi has appealed those decisions to vindicate its right to operate free from state interference. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025), *appeal argued*, No. 25-1892 (4th Cir. May 7, 2026); *KalshiEX LLC v. Bird*, No. 4:26-cv-00109-SHL-HCA (S.D. Iowa Sep. 8, 2026), *appeal docketed*, No. 26-2874 (8th Cir. Sep. 17, 2026); *KalshiEX LLC v. Williams*, No. 1:25-cv-08846, 2026 WL 1961872 (S.D.N.Y. July 7, 2026), *appeal pending*, No. 26-1835 (2d Cir.); *KalshiEX LLC v. Cafferelli*, No. 3:25-cv-2016, 2026 WL 2294589 (D. Conn. Aug. 10, 2026), *appeal pending*, No. 26-2239 (2d Cir.); *KalshiEX LLC v. Cox*, No. 2:26-cv-00151, 2026 WL 2241564 (D. Utah Aug. 4, 2026), *appeal pending*, No. 26-4100 (10th Cir.); *see also* Order, *United States v. Wisconsin*, No. 26-cv-00749 (E.D. Wis. July 29, 2026), *appeal docketed*, Nos. 26-2675, 26-2636, 26-2696 (7th Cir).

that it is free to impose its own regulatory regime on a 50-state federal derivatives exchange that is operating in conformance with federal law, as confirmed by its exclusive federal regulator. A preliminary injunction is necessary to restore the federal-state balance that the Constitution mandates.

13. The Supremacy Clause is designed to prevent this intolerable situation by making clear that—where federal and state law conflict—state law must give way. Kalshi therefore respectfully requests that this Court grant the preliminary and permanent injunctive and declaratory relief necessary to restore the federal government's exclusive jurisdiction over event contracts traded on DCMs.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution. The federal question presented is whether Louisiana's gambling and sports-wagering laws and regulations, including La. Stat. Ann. §§ 14:90, 14:90.1, 14:90.3, 27:19.1, 27:19.2, 27:604, and 51:1405(A), are preempted by the CEA, 7 U.S.C. §§ 1 *et seq*, as applied to Kalshi's event contracts.

15. The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials. As the Fifth Circuit has explained, *Ex parte Young*, 209 U.S. 123 (1908), "permits suits against state officials that seek the enjoinment of a state law that allegedly conflicts with federal law." *White Hat v. Murrill*, 141 F.4th 590, 600 (5th Cir. 2025) (citation omitted).

16. Venue is proper under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

17. Plaintiff Kalshi is a financial services company with its principal place of business in New York. Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts. Its exchange market is federally regulated by the CFTC pursuant to the CEA, 7 U.S.C. §§ 1 *et seq.*

18. Defendant Liz Murrill is sued in her official capacity as Attorney General of Louisiana.

19. Defendant Dawn Himel is sued in her official capacity as Director of the Louisiana Attorney General Office's Gaming Division.

20. Defendant Jeff Landry is sued in his official capacity as the Governor of Louisiana.

21. Defendant Louisiana Gaming Control Board is sued as the state agency that regulates "all gaming activities and operations in the state," including through investigation, licensing, and enforcement, and that may impose civil penalties for violations of the Louisiana Sports Wagering Act. La. Stat. Ann. § 27:15(A), (B)(1)(a), (D). The Board regulates casino, riverboat, racetrack slot machine, video draw poker, fantasy sports, and sports wagering activities in Louisiana, and asserts authority over "all aspects of sports wagering activities and operations." *Id.* § 27:15.1.

22. Defendant Christopher B. Hebert is sued in his official capacity as Chairperson of the Louisiana Gaming Control Board.

23. Defendant Kathryn W. Becnel is sued in her official capacity as a member of the Louisiana Gaming Control Board.

24. Defendant Claude D. Jackson is sued in his official capacity as a member of the Louisiana Gaming Control Board.

25. Defendant Miquell M. Hennigan is sued in her official capacity as a member of the Louisiana Gaming Control Board.

26. Defendant Nicholas J. Langley is sued in his official capacity as a member of the Louisiana Gaming Control Board.

27. Defendant Julie A. Lewis is sued in her official capacity as a member of the Louisiana Gaming Control Board.

28. Defendant Robert L. Wyatt is sued in his official capacity as a member of the Louisiana Gaming Control Board.

29. Defendant Ronald J. Sholes is sued in his official capacity as a member of the Louisiana Gaming Control Board.

30. Defendant Ashley Anderson Traylor is sued in her official capacity as a member of the Louisiana Gaming Control Board.

31. Defendant Louisiana State Police, Gaming Enforcement Division is sued as the state agency with authority to regulate and control gaming activities and operations under the Louisiana Gaming Control Board's jurisdiction. La. Stat. Ann. § 27.20.

32. Defendant Robert Paul Hodges is sued in his official capacity as Superintendent of the Louisiana State Police and ex-officio member of the Louisiana Gaming Control Board.

33. Defendant Jarrod J. Coniglio is sued in his official capacity as the Secretary of the Louisiana Department of Revenue and ex-officio member of the Louisiana Gaming Control Board.

34. Together, Defendants would be responsible for enforcing any demand for Kalshi to comply with Louisiana state law that is preempted by federal law.

## FACTUAL ALLEGATIONS

### A. An Event Contract—Like Other Derivatives—Is a Recognized Financial Tool to Mitigate Risk.

35. Derivatives contracts are financial tools used to mitigate risk. Event contracts are a quintessential example of a derivatives contract. They identify a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position. For example, a derivatives contract might center around whether a magnitude 8 earthquake will take place in Los Angeles County before January 1, 2027. A purchaser may trade on either the "yes" or the "no" position on the contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

36. Event contracts are typically traded on an exchange—like the nationwide DCM operated by Kalshi—on which traders exchange positions with other traders in the marketplace. Importantly, event contracts do not reflect a "bet" against the "house." Because traders do not take a position against the exchange itself, traders' ability to hedge risk requires counterparties willing to assume risk in the hope of seeing a return. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place."). Kalshi's exchange links traders seeking to hedge or seeking returns based on the uncertainty associated with financially significant events.

37. The value of an event contract on a DCM like Kalshi is determined by market forces. An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence. During that period, individuals can buy and sell the contract at its fluctuating prices.

The ultimate value of an event contract is determined at its expiration date. If the underlying event occurs, the holder of the "yes" position is entitled to its full value. But if the underlying event does not occur, the holder of the "no" position gets the payment.

38. Traders price event contracts by reference to available information at any given time. If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase. The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur. Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year. The 30% figure can be informed by data points the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

39. Event contracts are a valuable means to hedge against event-driven volatility. Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure to real-world events in an uncertain market. There is no other widely available financial instrument with this unique capability to capture the risks of an event with potential economic consequences, which is a benefit not only to those who wish to hedge risk or seek return, but also to market observers and other economic actors.

40. To give just some of the many examples, this past February, researchers at the Federal Reserve published a paper, in which the "results suggest that Kalshi markets provide a high-frequency, continuously updated, distributionally rich benchmark that is valuable to both researchers and policymakers."[6] Findings in that paper included that "Kalshi markets are well-

---

[6] Anthony M. Diercks, Jared Dean Katz & Jonathan H. Wright, *Kalshi and the Rise of Macro Markets* 1, Fin. & Econ. Discussion Series Paper 2026-010, Bd. of Governors of the Fed. Rsrv. Sys. (Feb. 12, 2026), https://perma.cc/9EY4-M3HY.

behaved and broadly consistent with those from more established financial instruments," and that "in several episodes, they allocate probability mass in ways that may reflect the range of plausible macroeconomic outcomes better than traditional financial derivative or survey-based forecasts."[7] Further, Kalshi's "median and mode have a perfect forecast record on the day before the [Federal Open Market Committee] meeting, which represents a statistically significant improvement over the fed funds futures forecast,"[8] and, for headline consumer price index forecasts, "Kalshi provides a statistically significant improvement over the Bloomberg consensus forecast."[9] And, "Kalshi provides real-time, distributional forecasts for macroeconomic variables such as GDP, core CPI, and unemployment—markets for which options data have historically been unavailable."[10]

41. Other examples abound: in February, Kalshi announced a partnership with Tradeweb, a leading global operator of electronic marketplaces for rates, credit, equities, and money markets, which facilitates more than $2.6 trillion in notional value of instruments traded per day.[11] The partnership expands institutional access to data from Kalshi's market and facilitates trading by those same institutional investors on Kalshi's platform.[12]

42. And late last year, the real estate investment firm Arrived announced its plans to utilize Kalshi's event contracts to hedge the risk of a government shutdown impacting its business.[13] Kalshi's markets are not the province of large institutions alone: innumerable businesses used the platform to hedge in the past month, and Kalshi is expanding that access

---

[7] *Id.* at 2-3.
[8] *Id.* at 3.
[9] *Id.*
[10] *Id.*
[11] *Tradeweb and Kalshi Announce Strategic Partnership to Expand Institutional Access to Prediction Markets*, Tradeweb (Feb. 19, 2026), https://perma.cc/TX3T-V9XA.
[12] *See* Katherine Doherty and Sridhar Natarajan, *Wall Street Bond-Trading Hub Tradeweb Strikes Deal with Kalshi*, Bloomberg (Feb. 19, 2026), https://perma.cc/K292-RLGK.
[13] *See* Ryan Frazier, LinkedIn (2025), https://www.linkedin.com/posts/activity-7386091007588749312-rhxN [https://perma.cc/CQN6-JK3M]; *see also* Michael J. de la Merced, *Kalshi, a Prediction Market, Raises $1 Billion in a New Round*, N.Y. Times DealBook (Dec. 2, 2025), https://perma.cc/VUY8-HCDT.

further.[14] Last month, Kalshi announced a partnership with the United States Hispanic Chamber of Commerce—the nation's largest small business advocacy group—and the Greater Washington Hispanic Chamber of Commerce, to provide risk-management tools and financial education to small businesses that have historically lacked access.[15]

43. Defendants' comments have been focused in particular on Kalshi's sports event contracts. But these are swaps that fall under the CFTC's exclusive jurisdiction. That is because, as both courts and the CFTC have recognized, sporting events can have significant economic consequences for a broad ecosystem of stakeholders. *Raoul*, 2026 WL 2969682, at *8-11; *KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025); Amicus Br. of CFTC at 19-20, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ("CFTC Amicus Br."); Further Definition of "Swap" – Inclusions, 91 Fed. Reg. at 66,025-26, 66,028, 66,031. Advertisers, sponsors, television networks, local communities, sportsbooks, and others all stand to gain or lose substantial sums depending on the outcomes of sports events.[16] Sports event contracts thus offer these entities opportunities to hedge their exposure. And that is happening in the market right now.

44. Take, for example, Game Point Capital, a sports-focused insurance firm that works with college athletic departments, pro teams, and sponsors to insure risk related to performance bonuses, coach salary buyouts, postseason and ticket revenue, and other areas of economic exposure.[17] Game Point Capital uses Kalshi to hedge, and it intends to do so for $30 million in

---

[14] Mary Cunningham, Small Businesses Roll the Dice on Kalshi to Manage Their Risks, CBS News (Sept. 24, 2026), https://www.cbsnews.com/news/kalshi-small-business-hedge-financial-risk/.

[15] How Hispanic-Owned Small Businesses Can Use Prediction Markets To Hedge Risk, Kalshi News (Sept. 15, 2026), https://news.kalshi.com/p/how-hispanic-owned-small-businesses-can-use-prediction-markets-to-hedge-risk.

[16] L. Solomon & R. Givone, *The Financing Gap in Sports: Unlocking a $2.5 Trillion Opportunity*, Apollo (Aug. 11, 2026), https://perma.cc/6AVP-ZT9K.

[17] *Services*, Game Point Cap., https://www.gamepointcapital.com/services; *see also* Paul Steinbach, *UConn Insured Basketball Coach Bonuses and Saved Nearly $3M*, Athletic Bus. (Apr. 23, 2024), https://perma.cc/XLY7-LBFJ

risk annually.[18] Other market participants have recognized the hedging utility of sports event contracts as well. In an April 2026 submission to the CFTC on event contracts and prediction markets, Susquehanna International Group explained that media companies and advertisers use sports-related event contracts to hedge risks tied to viewership, game outcomes, point spreads, and totals, and that businesses are already using these markets to hedge real economic risks.[19] Similarly, Underdog Sports, a fantasy sports company, used Kalshi as a tool to "hedge against volatility" on its own platform.[20]

45. Small businesses are doing the same. This past June, a New York City bar promised customers free tabs if the Knicks won Game 1 of the NBA Finals, and it used Kalshi to offset that risk. The last time the bar had run a Knicks-based promotion, it lost $4,000.[21] A Washington, D.C. bar likewise used Kalshi to hedge a promotion tied to Team USA's World Cup results.[22]

46. Event contracts—including sports event contracts—are also a valuable means of communicating information to the public because contract prices reflect prevailing market opinions and conditions. For example, a company that sponsors a professional sports team might look to a prediction market to assess how well the team is predicted to perform, and thus how lucrative its sponsorship is likely to be. That informational function is especially valuable because sports are an institutional-grade asset class: the business of sports is a $2.5 trillion global

---

(Game Point Capital wrote insurance contract that saved university nearly $3 million in bonus payments to coaches related to NCAA tournament performance).

[18] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5.

[19] *See* Susquehanna Int'l Grp. LLP, Comment Letter on Prediction Markets (Apr. 30, 2026), https://perma.cc/FYB6-6B5X.

[20] *See* Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management,* InGame (Oct. 20, 2025), https://perma.cc/BT4A-BK8T.

[21] Cathrine Gioino, *This NYC Bar Just Covered Everyone's Tabs Because the Knicks Won, and Used Kalshi to Hedge Their Bets*, Fortune (June 3, 2026), https://perma.cc/J5LF-GXEZ; *see also* Ben Shimkus & Jack Newsham, *An NYC bar promised free drinks if the Knicks win. Its owner is using Kalshi to hedge the risk.*, Bus. Insider (June 2, 2026), https://perma.cc/SFR4-EBKM.

[22] Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679.

ecosystem, live media rights are worth more than $60 billion annually, and the global sponsorship market is approaching $100 billion a year and is expected to double over the next decade.[23] Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions. This is not theoretical. Kalshi has announced partnerships with CNN, CNBC, and FOX which make use of its market data in their reporting.[24]

47. Kalshi has also launched a platform, Kalshi Research, to share market data with academics and promote research derived from the same.[25] Data generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event. *See* 7 U.S.C. § 5(a) (derivatives contracts, including event contracts, "are affected with a national public interest by providing" both a means for hedging risk and "disseminating pricing information through trading in liquid, fair and financially secure trading facilities").

**B. The CEA Establishes an Exclusive Federal Scheme for Regulating Event Contracts Traded on DCMs, including Kalshi.**

48. The CEA establishes a comprehensive federal scheme for regulating the trading of derivatives—including event contracts.

49. Under that scheme, the public can only trade event contracts and other derivatives on a board of trade like Kalshi that the CFTC has designated as a contract market, or DCM. 7 U.S.C. §§ 2(e), 6(a)(1), 7(a); 17 C.F.R. § 38.3(a). To be designated as a DCM, an entity must first

[23] Al Tylis et al., The Financing Gap in Sports: Unlocking a $2.5 Trillion Opportunity 3-4, Apollo (Dec. 2025).
[24] *See* James Faris, *Prediction giant Kalshi strikes a new media partnership with CNBC, days after its CNN deal*, Bus. Insider (Dec. 4, 2025), https://perma.cc/6XNU-XXND; R.T. Watson, *Kalshi inks exclusive CNBC deal as prediction markets surge into mainstream media*, The Block (Dec. 4, 2025), https://perma.cc/D2SH-ZLF7; *FOX to Integrate Kalshi Forecasts Across FOX News Media and FOX One Platforms*, FOX (Apr. 7, 2026), https://perma.cc/Y49P-D4PZ.
[25] *See Kalshi launches new research arm*, Kalshi News (Dec. 22, 2025), https://perma.cc/9MTE-VUGG.

submit an application to the CFTC detailing how the entity complies with the Core Principles of the CEA. 17 C.F.R. § 38.3(a)(2). Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor, and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. *Id.* §§ 38.100, 38.150, 38.200, 38.250, 38.300. Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA. *Id.* § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission. *Id.* § 38.3(a)(1).

50. The CEA expressly grants the CFTC "exclusive jurisdiction" over derivatives traded on DCMs—including event contracts. 7 U.S.C. § 2(a)(1)(A). Specifically, the statute provides that the CFTC "shall have exclusive jurisdiction" that covers "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' [or other specified instruments]), and transactions involving swaps or contracts of sale of a commodity for future delivery" where the derivative is "traded or executed on a contract market designated pursuant to section 7." *Id.*

51. The CEA then defines "swap" to cover a wide range of instruments including event contracts. It specifies that a "swap" includes "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). And lest there be

any doubt, it includes a catch-all defining "swap" to cover any instrument "that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv).

52. The term "commodity" is given a similarly broad meaning, which includes occurrences. 7 U.S.C. § 1a(9). The CEA includes a special category known as "excluded commodit[ies]" (because they are excluded from certain statutory restrictions on trading) that covers intangibles like an interest rate, *id.* § 1a(19)(i), or "an occurrence, extent of an occurrence, or contingency . . . beyond the control of the parties to the relevant contract" and "associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(iv). The CEA therefore makes clear that "event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities" that are based on an "occurrence, extent of an occurrence, or contingency." *Id.* § 7a-2(c)(5)(C)(i).

53. The CEA also contains a "Special [R]ule" for "Event Contracts." *Id.* §7a-2(c)(5)(C)(i). Recognizing that certain event contracts might warrant closer CFTC scrutiny, Congress authorized the CFTC to review and prohibit six categories of contracts if it concludes they are "contrary to the public interest." *Id.* §7a-2(c)(5)(C)(ii).

54. The Special Rule provides that the CFTC "may"—but need not—"determine" that event contracts are contrary to the public interest if they "involve":

(I) activity that is unlawful under any Federal or State law;
(II) terrorism;
(III) assassination;
(IV) war;
(V) gaming; or
(VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

*Id.* § 7a-2(c)(5)(C)(i); *see* 17 C.F.R. § 40.11. No such contract "determined by the Commission to be contrary to the public interest" may be listed on a DCM. 7 U.S.C. § 7a-2(c)(5)(C)(ii). Absent

an adverse public-interest determination, however, Congress did not bar event contracts involving the Special Rule's enumerated activities.

55. The CEA also includes a number of provisions that expressly address the states' regulatory and enforcement powers. Most notably, immediately after Section 2(a) grants the CFTC "exclusive jurisdiction" over derivatives trading "on a contract market designated pursuant to" *Id.* § 7, the statute provides that "*[e]xcept as hereinabove provided*, nothing contained in this section shall . . . supersede or limit the jurisdiction . . . of any State." *Id.* § 2(a)(1)(A). The clear implication is that the CEA "supersede[s]" state authority regarding trading on DCMs, but not off.

56. Both the "exclusive jurisdiction" provision and this savings clause were introduced to the statute in 1974 after decades of debate about whether and to what extent states should be able to apply their laws—including their gambling laws—to trading on DCMs. When the CEA was first enacted in 1936, states often attempted to apply their gaming laws to trading on designated markets, and the Supreme Court interpreted some of the language in the original CEA to authorize this practice to continue, thereby permitting concurrent state and federal regulation of derivatives markets. Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 670-693 (1982).

57. By 1974, however, Congress recognized that federal regulation would only be workable if it "prevent[ed] any possible conflicts over jurisdiction." *Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agric.*, 93d Cong. 128 (1974). Congress therefore both eliminated the language the Supreme Court had interpreted to allow concurrent jurisdiction and added the "exclusive jurisdiction" provision. S. Rep. No. 93-1131, at 31 (1974). Moreover, when the House tried to soften the exclusive-jurisdiction provision by adding the savings clause, the Senate insisted on amending that clause to

ensure it applied only "except as hereinabove provided." *Id.* The language ensured that "where the jurisdiction of the [CFTC] is applicable, it supersedes State as well as Federal agencies." *Id.* at 23.

58. Other provisions of the CEA that address the states similarly protect the CFTC's exclusive authority to regulate trading on DCMs, while preserving states' authority to regulate most off-DCM transactions. For example, in 1978, Congress added Section 13a-2, entitled "Jurisdiction of States." That section provides states with some ability to bring suits to enforce the CEA against entities "*other than a contract market*" or other designated trading facility, as well as preserving the states' authority to bring state court proceedings regarding "general civil or criminal antifraud" laws. 7 U.S.C. §§ 13a-2(1), (7) (emphasis added). Similarly, in 1982, Congress added what is now Section 16(e)(1). That provision reiterates that the CEA generally does not preempt other federal or state laws for transactions "not conducted on or subject to the rules of a registered entity," such as a DCM. *Id.* § 16(e)(1)(B)(i). Section 16(e)(2), added in 2000, goes on to establish certain narrow circumstances in which state "gaming" and "bucket shop[]" laws are preempted even with respect to off-DCM transactions. *Id.* § 16(e)(2).

59. The CEA thus sets out a highly reticulated federal scheme for regulating event contracts and other derivatives traded on DCMs like Kalshi, and it grants the CFTC "exclusive jurisdiction" over event contracts while preserving state authority to regulate transactions that occur outside of a DCM.

60. Congress confirmed the same understanding in the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA"). Although UIGEA generally prohibits the use of the internet to transmit wagers between states "where such bet or wager is unlawful," 31 U.S.C. § 5362(10)(A), Congress provided that the term "bet or wager" "does not include" transactions conducted on "a

registered entity . . . under the Commodity Exchange Act," *id.* § 5362(1)(E)(ii). UIGEA thus underscores Congress's understanding that state gaming laws do not reach trading on DCMs. *See Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-6162, 2025 WL 3141202, at *6 (N.D. Cal. Nov. 10, 2025) (Kalshi's "internet contracts are not bets or wagers under the UIGEA and therefore do not constitute 'unlawful internet gambling'").

61. In 2020, the CFTC designated Kalshi as a contract market, affirming that its trading platform complies with the CEA. *KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *4 (D.D.C. Sep. 12, 2024). Since then, Kalshi has been fully regulated as a financial exchange under federal law, alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

62. Kalshi specializes in event contracts, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

63. Kalshi offers many kinds of event contracts related to an array of substantive areas like economics, finance, climate, technology, health, crypto, popular culture, and sports. For example, Kalshi's platform currently allows users to trade on the level of US GDP growth in Q2 2026, the closing price of the S&P 500 at the end of 2026, whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030. Kalshi also offers contracts on congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

64. Prior to making a contract available for trade on its platform, Kalshi self-certifies to the CFTC, pursuant to section 7a-2(c)(1) of the CEA, that the offering complies with the CEA and CFTC regulations. *See* 7 U.S.C. § 7a-2(c)(1). Those certifications contain extensive

information, including in confidential appendices not available to the public, for the CFTC's review.

65. The CFTC also has the ability to require Kalshi to submit a "Demonstration of [C]ompliance," which is "a written demonstration, containing supporting data, information and documents" that a DCM is required to file upon request from the CFTC to explain how the DCM "is in compliance with one or more core principles as specified in the request." 17 C.F.R. § 38.5(b).

66. The CFTC did just that with respect to Kalshi's first sports event contracts, and Kalshi responded with lengthy memoranda detailing the listing's compliance with applicable rules and regulations, and the CFTC's jurisdiction over sports event contracts traded on DCMs. *KalshiEX LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *5 (M.D. Tenn. Feb 19, 2026). The CFTC took no further action and has since allowed thousands of Kalshi's sports event contracts to be listed, traded, and closed, exactly as other derivatives contracts are listed, traded, and closed on the DCMs the CFTC oversees.

67. The CFTC has repeatedly confirmed that Kalshi's contracts—including its sports event contracts—fall within the CFTC's exclusive regulatory jurisdiction. In addition to its recent NPRM regarding sports event contracts, the CFTC has filed amicus briefs making clear that "the transactions conducted on a CFTC-registered DCM qualify as swaps under the CEA" and that "the CEA expressly bars state laws from regulating or prohibiting these transactions that are conducted on CFTC-regulated DCM." Amicus Br. of CFTC at 1, 20, 26, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ("CFTC Br."). It has also brought lawsuits against nine states that have sought to subject DCMs to state gambling laws,[26] and has

[26] *See generally* CFTC Complaints.

obtained preliminary injunctions against state enforcement in district courts in Arizona, Minnesota, and Illinois. *Johnson*, 2026 WL 1223373, at *9 (enjoining state enforcement action against exchange because exchange and CFTC "are likely to prevail on their claim that the CEA's grant of 'exclusive jurisdiction' preempts the State's enforcement of its gambling laws against DCM operators offering event contracts").

### C. The CFTC Has Proposed and Adopted a Detailed Regulatory Framework Governing Sports Event Contracts on DCMs.

68. In June 2026, the CFTC issued a 267-page Notice of Proposed Rulemaking ("NPRM") underscoring its exclusive jurisdiction over prediction markets—and sports event contracts traded on those markets. Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026) (to be codified at 17 C.F.R. pt. 40). The NPRM confirms that the CEA "expressly preempts state laws" with respect to event contracts on DCMs. *Id.* at 35,808. It underscores that event contracts are "swaps" that serve "price discovery" functions and "allow market participants to hedge exposure to a wide array of events for which no traditional financial instrument otherwise exists," including "sporting events" that "generate billions of dollars in economic activity and materially affect both regional and national markets." *Id.* at 35,807-08 (citation modified).

69. In October 2026, the CFTC took two further steps under its express authority to define "swap." *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-95 (2024); 15 U.S.C. § 8302(d)(1). First, on October 9, it issued an Interim Final Rule, "effective immediately," excluding from the "swap" definition contracts "regulated as gaming or gambling under applicable State or Tribal law" and "not traded on a board of trade" or other "organized exchange." Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. at 65,971, 65,979. The rule

rejects the "erroneous premise" "that if event contracts are swaps, then casino-style gambling products must also be swaps." *Id.* at 65,977.

70. Second, the same day, the CFTC proposed defining "swap" to include "[e]vent contracts, including those based on sports-[related] … events." Further Definition of "Swap" – Inclusions, 91 Fed. Reg. at 66,031. The CFTC explains that the statute already covers these contracts, and that the rule "provides an independent legal basis to deem these contracts as swaps." *Id.* at 66,025-26, 66,028. Together, these rulemakings confirm that Kalshi's sports event contracts are swaps within the CFTC's exclusive jurisdiction.

### D. The Louisiana Gaming Control Board's and Attorney General Murrill's Statements Concerning Event Contracts.

71. On December 5, 2025, the Louisiana Gaming Control Board (the "Board") issued an "Advisory Notice Regarding Prediction Markets" (the "Advisory Notice"), signed by Defendant Chairman Christopher B. Hebert. Ex. 1. The Advisory Notice was directed to Louisiana "licensees, permittees, and associated persons." *Id.* at 1. In it, the Board declared that it "considers purported sporting event contracts and certain other event contracts as illegal gambling in violation of the Louisiana Criminal Code and Louisiana Gaming Control Law." *Id.* at 2. The Board relied on the gambling definitions in La. Stat. Ann. §§ 14:90 and 14:90.3, and on La. Stat. Ann. § 27:602, which treats "exchange wagering" as a "sports wager." The Board made clear that its position reaches federally regulated exchanges: "[i]llegal sports wagering may occur whether the contract is listed on an exchange regulated by the Commodity Futures Trading Commission ('CFTC') or elsewhere." Ex. 1 at 2. It also explained that its position covers contracts "based on the outcome or partial outcome of any sporting or athletic event, or other selected events," which it called "Sports and Other Event Contracts." *Id.*

72. The Board then rejected federal law as a defense. It stated that it "does not consider Sports and Other Event Contracts as commodities transactions regulated by the CFTC," and that, "[r]egardless of how the platform labels the product, the determinative factor is the underlying event and/or activity." *Id.* It stated that such contracts "may be offered in Louisiana only if the offering entity possesses a sports wagering gaming license or permit in Louisiana." *Id.* And it concluded that, because it views the contracts as "both gaming and illegal," the Board "sees no defense to offering such activity pursuant to a CFTC license." *Id.* The Board copied the Advisory Notice to Defendant Louisiana State Police Gaming Enforcement Division. It also copied the Director and Deputy Director of the Attorney General's Gaming Division, Dawn M. Himel and Matthew Meek.

73. Louisiana officials have repeated these positions publicly. In a March 12, 2026 article in The Advocate, Defendant Attorney General Liz Murrill said of prediction markets: "I'm very concerned about them. . . . They literally will let people bet on anything you can think of. That's gambling." Ex. 2 at 4. Defendant Chairman Hebert said: "We are actively seeking ways to stop this." *Id.* at 5. According to the article, Chairman Hebert said that licensed platforms had assured the State they would not offer prediction markets in Louisiana. Attorney General Murrill added: "We've made it very clear that if you're doing something that we think is illegal then it could jeopardize your legal license." *Id.* at 11. Director Himel of the Attorney General's Gaming Division said: "The Commodity Exchange Act prohibits contracts on anything gaming or anything illegal in the state . . . . It wasn't enacted to federalize wagering on sports." *Id.* at 14. Director Himel also criticized prediction markets for allowing wagers from people as young as 18 and allowing in-game prop wagers that Louisiana prohibits. In her words, "[t]he prediction markets don't have those controls." *Id.* at 9.

74. Louisiana officials have also consistently supported other states' efforts to regulate Kalshi and other DCMs, in contravention of federal law, by signing amicus briefs in the United States Court of Appeals for the Third Circuit on June 17, 2025, the Fourth Circuit on December 22, 2025, and the Ninth Circuit on January 30, 2026, which claim that Kalshi is violating comparable state laws.[27] Those amicus briefs argue that states, not just the CFTC, have the power to regulate Kalshi's sports event contracts, and that such contracts constitute illegal sports gambling under the signatory states' laws.

75. Upon information and belief, Defendants will imminently bring an enforcement action against Kalshi to stop it from offering event contracts for trading on its federally regulated exchange. In doing so, Defendants would seek to subject Kalshi to the patchwork of state regulation that Congress created the CFTC to prevent, and to interfere with the CFTC's exclusive authority to regulate derivatives trading on the exchanges it oversees.

**E. Defendants Pose Imminent Risk of Enforcement Against Kalshi**

76. Defendants have provided no assurance that they will refrain from enforcing Louisiana law against Kalshi, and no non-enforcement agreement exists between Kalshi and Louisiana.

77. Kalshi therefore has no option but to seek judicial relief. The Board's Advisory Notice, the public statements of Defendant Chairman Hebert and Defendant Attorney General Murrill, and the amicus briefs Attorney General Murrill signed in federal courts of appeals across the country make clear that Defendants believe Kalshi's offering of event contracts in Louisiana violates Louisiana law. With the enforcement powers that took effect on August 1, 2026, Kalshi

---

[27] *See generally* Br. of Amici Curiae, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. June 17, 2025), Dkt. No. 29; Br. of Amici Curiae, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Dec. 22, 2025), Dkt. No. 41; Br. of Amici Curiae, *KalshiEX LLC v. Assad*, No. 25-7516 (9th Cir. Jan. 30, 2026), Dkt. No. 48.1.

may be immediately subjected to action by the State. Absent any assurances of non-enforcement, Kalshi (and its users) face a threat of irreparable harm, leaving Kalshi with no choice to protect its commercial interests and those of its users except to bring this suit.

78. Following the filing of this complaint, Kalshi intends to inform Defendants of its filing, and Kalshi's intent to seek preliminary injunctive relief. Kalshi will also inform the Defendants that, unless Defendants assure Kalshi they will not begin an enforcement proceeding while Kalshi's motion for a preliminary injunction is pending, Kalshi will additionally seek a temporary restraining order barring such an action.

## REQUISITES FOR RELIEF

79. As a result of Defendants' threatened conduct described above, including the Board's Advisory Notice, the public statements of Defendant Chairman Hebert and Defendant Attorney General Murrill, and the amicus briefs Attorney General Murrill signed, there is a strong likelihood that Defendants will take action, including, but not limited to, seeking to enforce preempted state law in violation of the Supremacy Clause of the U.S. Constitution, which will subject Kalshi and its customers to irreparable harm.

80. An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties. Defendants' conduct alleged herein, including threats to Kalshi, has already resulted in, and will continue to result in, irreparable injury to Kalshi, including but not limited to economic hardship, lost business opportunities, and impairment of existing contractual relationships.

81. Kalshi has no plain, speedy, or adequate remedy at law to address the wrongs described herein. Kalshi therefore seeks declaratory and injunctive relief restraining Defendants

from enforcing Louisiana's gambling and sports wagering laws that interfere with the operation and function of Kalshi's DCM described herein.

**COUNT I**

**(Supremacy Clause—Preemption by Commodity Exchange Act)**

82. Plaintiff incorporates all prior paragraphs by reference.

83. The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

84. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

85. Congress expressly preempted state law by giving the CFTC "exclusive jurisdiction" to regulate futures trading on approved exchanges, including the trading of event contracts on DCMs like Kalshi. 7 U.S.C. § 2(a)(1)(A).

86. In threatening to enforce La. Stat. Ann. §§ 14:90, 14:90.1, 14:90.3, 27:19.1, 27:19.2, 27:604, and 51:1405(A), Defendants are impermissibly intruding on the CFTC's "exclusive jurisdiction" to regulate derivatives trading on CFTC-regulated exchanges. 7 U.S.C. § 2(a)(1)(A). Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same putative subject matter. Yet Defendants' threatened actions specifically target event contracts on a DCM and such state efforts to regulate contracts within the CFTC's "exclusive jurisdiction" are expressly preempted by the CEA.

87. In addition, federal law occupies the entire field of regulating trading on designated contract markets, and Defendants' threat to enforce La. Stat. Ann. §§ 14:90, 14:90.1, 14:90.3, 27:19.1, 27:19.2, and 27:604 is both expressly and impliedly field-preempted under the Supremacy Clause. As the Third Circuit held in concluding that state laws are field preempted, the CEA's text "preempts state laws that directly interfere with swaps traded on DCMs," and because Kalshi's event contracts are swaps traded on a CFTC-licensed DCM, "the CFTC has exclusive jurisdiction." *Flaherty*, 172 F.4th at 225-226.

88. Louisiana law is also preempted as applied to Kalshi because it conflicts with federal law and policy. Defendants seek to ban event contracts that federal law and the CFTC have authorized unless the DCM offering those contracts submits to the state-specific licensing and regulatory regime. Doing so would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. Congress passed the 1974 amendments to the CEA to bring futures markets regulation "under a uniform set of regulations." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). "As Congress recognized in enacting the 1974 Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Id.* The Seventh Circuit thus explained that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (citation omitted).

89. This conflict with the CEA is even clearer when considering that 49 other states and the District of Columbia might similarly attempt to subject Kalshi to their own state laws, producing the patchwork of state-by-state regulation Congress sought to prevent. As the Third

Circuit held, state regulation of Kalshi's event contracts "would create an obstacle to executing the [CEA] because such state enforcement would prohibit Kalshi, which operates a licensed DCM under the exclusive jurisdiction of the CFTC, from offering its sports-related event contracts," resulting in "exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230.

90. Additionally, a state law stands as an "obstacle" to a federal regulatory scheme if Congress chooses a specific enforcement method to achieve federal goals and a state law adopts a different method of enforcement, *Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 528–29 (5th Cir. 2013) (en banc) (plurality opinion), that hampers "the careful balance struck by Congress," *Arizona v. United States*, 567 U.S. 387, 406 (2012). Where Congress grants a federal agency broad enforcement discretion, a state regime that allows for state prosecutions of the same actions frustrates the congressional scheme. *See Am. Agric.*, 977 F.2d at 1155-57 (holding that where Congress vested the CFTC with exclusive regulatory authority, permitting state law claims would "frustrate Congress' intent to bring the markets under a uniform set of regulations"). Under federal law, once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts for trading by self-certifying that these contracts comported with federal law. The CFTC had the authority to review that self-certification if it concluded Kalshi's contracts fell within a category enumerated in the Special Rule and were "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i) but chose not to do so. The CFTC's Enforcement Division has authority to investigate and initiate enforcement actions seeking an array of penalties in federal court or administrative proceedings, but, again, it chose not to do so. Congress thus gave the CFTC a variety of tools for enforcing federal law against federally designated contract markets and entrusted the CFTC with discretion to pursue the penalties it

deems most appropriate. Subjecting federally regulated exchanges to state laws like Louisiana's would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Am. Agric.,* 977 F.2d at 1156-57.

91. Furthermore, Defendants' threat of enforcement conflicts with the CFTC Core Principles on which Kalshi's designation as a CFTC-approved market depends. The CFTC's Core Principle 2 requires Kalshi to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services." 17 C.F.R. §§ 38.150, 38.151(b) (emphasis added). If Kalshi is forced to cease offering sports event contracts to Louisiana residents, it will inevitably violate that "impartial access" requirement because, as the CFTC itself has recognized, "a DCM is required by federal law to provide 'impartial access' to all eligible participants nationwide." CFTC Amicus Br. at 26. In addition, Core Principle 4 requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of price distortions and *market disruptions*." 17 C.F.R. § 38.255 (emphasis added). Abruptly closing Kalshi's event contracts to some users based on geography would constitute exactly the sort of market disruption the CFTC has directed Kalshi to prevent. Depending on the CFTC's interpretation of its Core Principles, it could well be that "it is impossible for [Kalshi] to comply with both state and federal requirements"—the paradigmatic case for preemption. *Estate of Miranda v. Navistar, Inc.*, 23 F.4th 500, 504 (5th Cir. 2022) (citation omitted).

92. Defendants may not enforce La. R.S. 14:90, 14:90.1, 14:90.3, 27:19.1, 27:19.2, and 27:604, or any related anti-gambling laws, against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq.*, and La. Stat. Ann. §§ 14:90, 14:90.1, 14:90.3, 27:19.1, 27:19.2, and 27:604 expressly infringe upon that exclusive oversight.

93.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1. Enter a judgment declaring that the use of La. Stat. Ann. §§ 14:90, 14:90.1, 14:90.3, 27:19.1, 27:19.2, and 27:604, or any related state laws, in a manner to effectively regulate Plaintiff's designated contract market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff and its affiliates, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2. Enter a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing La. Stat. Ann. §§ 14:90, 14:90.1, 14:90.3, 27:19.1, 27:19.2, and 27:604, or any other Louisiana law that attempts to effectively regulate Plaintiff's exchange, against Plaintiff and its affiliates;

3. Any other relief within this Court's discretion that it deems just and proper.

Dated: October 23, 2026

Respectfully submitted,

*/s/ Michael A. Balascio*
George C. Freeman, III, 14272
Michael A. Balascio, 33715
**BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, LLC**
909 Poydras Street, Ste. 2350
New Orleans, LA 70112
Telephone: 504-589-9700
Facsimile: 504-589-9701
gfreeman@barrassousdin.com
mbalascio@barrassousdin.com

and

Neal Kumar Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
Colleen E. Roh Sinzdak (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice* forthcoming)
Katherine Kelly Fell (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
Nicole D. Valente (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff KalshiEX LLC*