**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**

KALSHIEX LLC,

Plaintiff,

vs.

LIZ MURRILL, in her official capacity as Attorney General of Louisiana; DAWN HIMEL, in her official capacity as Director of the Louisiana Attorney General Office's Gaming Division; JEFF LANDRY, in his official capacity as Governor of Louisiana; LOUISIANA GAMING CONTROL BOARD; CHRISTOPHER B. HEBERT, in his official capacity as Chairperson of the Louisiana Gaming Control Board; KATHRYN W. BECNEL, in her official capacity as a member of the Louisiana Gaming Control Board; CLAUDE D. JACKSON, in his official capacity as a member of the Louisiana Gaming Control Board; MIQUELL M. HENNIGAN, in her official capacity as a member of the Louisiana Gaming Control Board; NICHOLAS J. LANGLEY, in his official capacity as a member of the Louisiana Gaming Control Board; JULIE A. LEWIS, in her official capacity as a member of the Louisiana Gaming Control Board; ROBERT L. WYATT, in his official capacity as a member of the Louisiana Gaming Control Board; RONALD J. SHOLES, in his official capacity as a member of the Louisiana Gaming Control Board; ASHLEY ANDERSON TRAYLOR, in her official capacity as a member of the Louisiana Gaming Control Board; LOUISIANA STATE POLICE, GAMING ENFORCEMENT DIVISION; ROBERT PAUL HODGES, in his official capacity as Superintendent of the Louisiana State Police and ex-officio member of the Louisiana Gaming Control Board; and JARROD J. CONIGLIO, in his official capacity as Secretary of the Louisiana Department of Revenue and ex-officio member of the Louisiana Gaming Control Board,

Defendants.

Case No. 1:26-cv-04476

JUDGE: JERRY EDWARDS, JR.

MAGISTRATE: JOSEPH H. L. PEREZ-MONTES

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF A TEMPORARY RESTRAINING ORDER AND MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 3

A. Event Contracts. ..... 3

B. Statutory and Regulatory Background. ..... 7

C. This Litigation. ..... 10

ARGUMENT ..... 12

A. Kalshi Is Likely to Succeed on the Merits. ..... 12

1. The CEA's Grant of "Exclusive Jurisdiction" to the CFTC Preempts Louisiana's Gambling Laws as to Event Contracts Traded on DCMs. ..... 13

2. Kalshi's Event Contracts Fall Within the CFTC's Exclusive Jurisdiction. ..... 20

B. Kalshi Will Suffer Irreparable Harm Absent a TRO and Preliminary Injunction, and the Balance of Equities and Public Interest Favor Relief. ..... 23

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ....15, 17

*Arizona v. United States*,
567 U.S. 387 (2012)....17, 18

*Chi. Mercantile Exch. v. SEC*,
883 F.2d 537 (7th Cir. 1989) ....15

*Clews v. Jamieson*,
182 U.S. 461 (1901)....9

*Coinbase Fin. Mkts., Inc. v. Raoul*,
No. 1:25-cv-15406, 2026 WL 2969682 (N.D. Ill. Oct. 2, 2026) .... *passim*

*Cothran v. Ellis*,
16 N.E. 646 (Ill. 1888) ....9

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)....12, 17, 20

*Embrey v. Jemison*,
131 U.S. 336 (1889)....9

*Emerald City Mgmt., L.L.C. v. Kahn*,
624 F. App'x 223 (5th Cir. 2015) ....25

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982)....12

*Friberg v. Kan. City S. Ry. Co.*,
267 F.3d 439 (5th Cir. 2001) ....14

*Hines v. Davidowitz*,
312 U.S. 52 (1941)....12

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016)....14

*Irwin v. Williar*,
110 U.S. 499 (1884)....9

*KalshiEX LLC v. Assad*,
190 F.4th 1098 (9th Cir. 2026) ....2, 13, 15, 22

*KalshiEX LLC v. CFTC*,
No. 23-3257, 2024 WL 4164694 (D.D.C. Sep. 12, 2024) .......................................................4

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) ............................................................................... *passim*

*KalshiEX LLC v. Schuler*,
--- F.4th ----, No. 26-3196, 2026 WL 2884087 (6th Cir. Sep. 25, 2026)..........................15, 22

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980)................................................................................................5, 15

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..........................................................................................................10, 16

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982)............................................................................................................7, 17

*Mississippi v. Louisiana*,
506 U.S. 73 (1992)..................................................................................................................13

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)................................................................................................................23

*N. Nat. Gas Co. v. State Corp. Comm'n of Kan.*,
372 U.S. 84 (1963)..................................................................................................................14

*Nairn v. J.A. Acosta & Co. (In re Rosenbaum Grain Corp.)*,
103 F.2d 656 (7th Cir. 1939) ....................................................................................................9

*Paulsson Geophysical Servs., Inc. v. Sigmar*,
529 F.3d 303 (5th Cir. 2008) ..................................................................................................25

*Pearce v. Rice*,
142 U.S. 28 (1891)....................................................................................................................9

*Point Landing, Inc. v. Omni Cap. Int'l, Ltd.*,
795 F.2d 415 (5th Cir. 1986) ..................................................................................................14

*Polk v. Crawford*,
184 F.4th 715 (5th Cir. 2026) .................................................................................................24

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016)................................................................................................................14

*Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*,
608 F.2d 175 (5th Cir. 1979) ..................................................................................................14

*Rice v. Board of Trade of Chicago*,
331 U.S. 247 (1947) .....13, 14

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .....13, 17

*Space Expl. Tech. Corp. v. NLRB*,
151 F.4th 761 (5th Cir. 2025) .....12

*Tex. Ent. Ass'n, Inc. v. Hegar*,
10 F.4th 495 (5th Cir. 2021) .....24

*Tex. Midstream Gas Servs., L.L.C. v. City of Grand Prairie*,
2008 WL 5000038 (N.D. Tex. Nov. 25, 2008) .....3

*United States v. Brien*,
617 F.2d 299 (1st Cir. 1980) .....15

*United States v. Minnesota*,
--- F. Supp. 3d ----, No. 26-cv-2661, 2026 WL 2150211
(D. Minn. July 27, 2026) ..... *passim*

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) .....23

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .....12

*Xue v. Bowen*,
No. 26-1958, 2026 WL 1683137 (W.D. La. June 10, 2026) .....12

**Statutes**

5 U.S.C. § 551 .....22

7 U.S.C. § 1a ..... *passim*

7 U.S.C. § 2 ..... *passim*

7 U.S.C. § 5 .....3, 18, 21

7 U.S.C. § 7 .....9, 10, 17

7 U.S.C. § 7a-1 .....10

7 U.S.C. § 7a-2 .....8, 20, 21

7 U.S.C. § 8 .....10, 24

7 U.S.C. § 9 ....................10

7 U.S.C. § 12a ....................9

7 U.S.C. § 16 ....................15, 16, 22

15 U.S.C. § 8302 ....................10

31 U.S.C. § 5362 ....................16

1915 Ala. Laws 914 ....................9

1925 N.Y. Laws 547 ....................9

1962 S.C. Acts 1228-29 ....................9

1968 Ga. Laws 1319 ....................9

Commodity Exchange Act, Pub. L. No. 74-675, § 5, 49 Stat. 1491 (1936) ....................13

Grain Futures Act, Pub. L. No. 67-331, § 3, 42 Stat. 998 (1922) ....................3

La. Rev. Stat. § 14:90 ....................20

La. Rev. Stat. § 14:90.1 ....................12

La. Rev. Stat. § 14:90.3 ....................1, 11

La. Rev. Stat. § 27:19.1 ....................1, 11, 12

La. Rev. Stat. § 27:19.2 ....................1, 11, 12

La. Rev. Stat. § 27:605 ....................11, 19

La. Rev. Stat. § 27:607 ....................11, 19

La. Rev. Stat. § 27:608 ....................11

La. Rev. Stat. § 27:609 ....................11, 19

**Other Authorities**

17 C.F.R. pt. 38 ....................10

17 C.F.R. § 38.151 ....................18, 23

17 C.F.R. § 38.255 ....................24

120 Cong. Rec. 30,464 (1974) ....................13

156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) ........................................8, 21

Al Tylis et al., *The Financing Gap in Sports: Unlocking a $2.5 Trillion Opportunity* 6, Apollo (Dec. 2025), https://perma.cc/483U-HSQW ........................................6

Amicus Br. of CFTC, *KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), Dkt. No. 31 ........................................18

Amicus Br. of CFTC, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2........................................24

Andrea M. Corcoran, CFTC No-Action Letter, CFTCLTR No. 93-66, 1993 WL 595741 (June 18, 1993)........................................4

Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times: DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5........................................6, 21

Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679 ........................................6

Anthony M. Diercks et al., *Kalshi and the Rise of Macro Markets* 1, 4, Fed. Rsrv. Bd. Fin. & Econ. Discussion Series No. 2026-010 (Feb. 2026), https://perma.cc/9EY4-M3HY ........................................5

Appellant Br., *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Oct. 16, 2024), 2024 WL 4512583 ........................................16

Christopher J. Kirkpatrick, *DCM Impartial Access Requirements*, CFTC (Nov. 5, 2026), https://perma.cc/3SJ7-Y47P ........................................18, 19, 23, 25

Christopher J. Kirkpatrick, *Order Directing Kalshi to Continue Exercising DCM Functions*, CFTC (Aug. 11, 2026), https://perma.cc/6KYE-MPKQ ........................................20

Christopher J. Kirkpatrick, *Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents*, CFTC (July 14, 2026), https://perma.cc/GV5X-M9PQ ........................................19

*CME Group partners with FutureSports to introduce world's first futures on sports indexes*, CME Grp. (July 29, 2026), https://perma.cc/XJ7L-HKKA ........................................22

*Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. (1974) ........................................9, 20

Compl., *United States v. Arizona*, No. 2:26-cv-2246 (D. Ariz. Apr. 2, 2026), Dkt. No. 1 ........................................2, 16

Compl., *United States v. Connecticut*, No. 3:26-cv-498 (D. Conn. Apr. 2, 2026), Dkt. No. 1 ........................................2, 16

Compl., *United States v. Illinois*,
No. 1:26-cv-3659 (N.D. Ill. Apr. 2, 2026), Dkt. No. 1 ....................................................2, 16

Compl., *United States v. Kentucky*,
No. 3:26-cv-49 (E.D. Ky. June 23, 2026), Dkt. No. 1 ....................................................2, 16

Compl., *United States v. Minnesota*,
No. 0:26-cv-2661 (D. Minn. May 19, 2026), Dkt. No. 1..................................................2, 16

Compl., *United States v. New Mexico*,
No. 1:26-cv-1912 (D.N.M. June 12, 2026), Dkt. No. 1 ....................................................2, 16

Compl., *United States v. New York*,
No. 1:26-cv-3404 (S.D.N.Y. Apr. 24, 2026), Dkt. No. 1 ..................................................2, 16

Compl., *United States v. Utah*,
No. 2:26-cv-1055 (D. Utah Oct. 26, 2026), Dkt. No. 1 ....................................................2, 16

Compl., *United States v. Wisconsin*,
No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026), Dkt. No. 1....................................................2, 16

Concept Release,
73 Fed. Reg. 25,669 (May 7, 2008) ...........................................................................4, 16

Dylan Duke, *How much of an economic boom is the 2026 FIFA World Cup for the U.S. hosting cities?*, NPR (June 15, 2026), https://perma.cc/F64B-G5F4........................21

Event Contracts,
89 Fed. Reg. 48,968 (June 10, 2024) ..........................................................................4, 16

*Exclusive*, American Heritage Dictionary (5th ed. 2022) ..........................................................13

*Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agric.*, 95th ...................................................16

Frank N. Fisanich, Prediction Markets Advisory,
CFTCLTR No. 26-08, 2026 WL 734345 (Mar. 12, 2026) .......................................................4

Further Definition of "Swap" - Inclusions,
91 Fed. Reg. 66,022 (Oct. 19, 2026)..............................................................................10

Further Definition of "Swap" to Exclude Casino-Style Gambling Products,
91 Fed. Reg. 65,969 (Oct. 19, 2026).......................................................................... *passim*

*Goat herding hedge: How Susquehanna and Kalshi are helping this company offset a change in California law*, CNBC (Aug. 13, 2026),
https://perma.cc/49ZG-WA9B ...........................................................................................5

Goldman Sachs Private Wealth Mgmt., *Playing for Scale: The Future of Sports Investing* (Oct. 28, 2026), https://perma.cc/XY98-FWKS ....................................................6

Grace Asenov, *First Tungsten Hedge Trades on Prediction Market Kalshi*, Bloomberg (Oct. 22, 2026), https://perma.cc/9PU4-MXZZ....................................................5

H.R. Rep. No. 93-975 (1974)....................................................9

Intervenor Compl., *KalshiEX LLC v. Furcolo*, No. 1:26-cv-327 (D.R.I. June 26, 2026), Dkt. No. 37 ....................................................2, 16

John H. Stassen, *The Commodity Exchange Act in Perspective*, 39 Wash. & Lee L. Rev. 825 (1982)....................................................9

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657 (1982)....................................................14

Liz Hoffman, *Hedging a $15,000 New York Knicks bar tab on Kalshi*, Yahoo! Fin. (June 2, 2026), https://perma.cc/DFK9-GFM7 ....................................................21

Michael J. de la Merced, *Political Betting Markets See Vindication in Trump Victory*, N.Y. Times (Nov. 6, 2024) ....................................................5

Nick Gallo & Vikki Velasquez, *Understanding Prediction Markets Before You Trade*, Investopedia (Oct. 20, 2026), https://perma.cc/58ZR-KANQ ....................................................7

Paul Mueller, *The Knicks playoff run is a billion-dollar slam dunk for New York*, Fast Co. (June 5, 2026), https://perma.cc/L4YX-7MGD....................................................21

Pet. for Reh'g and Reh'g En Banc, *KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir. Oct. 9, 2026), Dkt. No. 92....................................................15

Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026) ....................................................4, 8, 20, 22

Richard Sine, *Prediction markets gain role in risk transfer*, Bus. Ins. (Oct. 26, 2026), https://perma.cc/E4G2-Q6KL....................................................5

Robert Brooks, *A Life Cycle View of Enterprise Risk Management: The Case of Southwest Airlines Jet Fuel Hedging*, J. Fin. Educ. 33 (2012) ....................................................3

Sasha Rogelberg, *Prediction markets are now 'bespoke insurance' for businesses, and a Los Angeles restaurant group's $60,000 hedge on Kalshi is the latest example*, Fortune (Oct. 19, 2026), https://perma.cc/X49M-US5U....................................................6, 21

Stuart A Thompson, *How Accurate Were Prediction Markets at Picking Midterm Winners?*, N.Y. Times (Nov. 6, 2026)....................................................5

Suzanne McGee, *Prediction markets take swing at hedging for US small businesses*, Reuters (Aug. 28, 2026) ....................................................................................5

## PRELIMINARY STATEMENT

For over half a century, it has been clear that the federal government—not the states—regulates trading on federally designated contract markets ("DCMs"). The Commodity Exchange Act ("CEA") grants a federal agency, the Commodity Futures Trading Commission ("CFTC"), "exclusive jurisdiction" over "agreements" and "swaps" "traded or executed" on those markets. 7 U.S.C. § 2(a)(1)(A). Congress broadly defined the term "swap" to encompass, among other things, event contracts—derivative "contract[s]" where payment depends on the "occurrence" of an "event … associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). Event contracts are a type of derivative like any other, except that instead of trading on the future price of a commodity, the trading is over whether other future events will occur. They can be used to hedge risk, and they provide valuable public information about how the market prices the likelihood of future events. Plaintiff KalshiEX LLC ("Kalshi") is a DCM that lists for trading several types of event contracts, including contracts involving sports events. The CEA therefore preempts state laws purporting to prohibit the trading of these swaps on Kalshi.

Nonetheless, based on discussions with representatives of the State of Louisiana since Kalshi filed its Complaint on October 23, 2026, Kalshi believes the State will imminently initiate an action in state court to restrict its operations in Louisiana. Declaration of Andrew L. Porter ("Porter Decl.") ¶¶ 4-5. As a result, Kalshi faces imminent criminal, administrative, and forfeiture exposure. *See* La. Rev. Stat. §§ 14:90.3(E), (I), (J), 14:90.1(B)(1), 27:19.1(G), 27:19.2(A)–(B). Louisiana threatens this, even though the federal agency with exclusive jurisdiction over Kalshi's contracts has repeatedly explained that they are lawful and allowed them to be listed and traded as swaps on Kalshi's DCM.

The Supremacy Clause does not tolerate that result. A state's prohibition of federally authorized derivatives trading is incompatible with the federal government's "exclusive

jurisdiction." 7 U.S.C. § 2(a)(1)(A). The CFTC has sued ten states to stop this encroachment.[1] Kalshi therefore seeks expedited injunctive relief to prevent Louisiana officials from enforcing La. Rev. Stat. §§ 14:90, 14:90.1, 14:90.3, 27:19.1, 27:19.2, 27:604, and 51:1405(A), or any other state law against Kalshi based on its operation of a federally regulated DCM.

As the Third Circuit and other courts around the country have held, preliminary injunctive relief is appropriate where—as here—a state threatens to enforce its laws against a DCM in violation of the CFTC's exclusive authority. *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 231-32 (3d Cir. 2026). Courts have repeatedly agreed that the CEA preempts state efforts to regulate DCMs in this manner. In barring New Jersey from regulating the trading of Kalshi's sports-event contracts, the Third Circuit explained that, because "Congress gave the CFTC exclusive jurisdiction over trades on DCMs," the CEA "preempt[ed] [state] law from reaching into Kalshi's CFTC-licensed" exchange. *Id.* at 231. The Ninth Circuit held that the "plain wording" of Section 2(a) "preempts state regulation of swaps that are 'traded or executed' on a DCM." *KalshiEX LLC v. Assad*, 190 F.4th 1098, 1110 (9th Cir. 2026). And other courts have enjoined materially identical attempts at regulating Kalshi's event contracts. *See, e.g.*, *United States v. Minnesota*, --- F. Supp. 3d ----, No. 26-cv-2661, 2026 WL 2150211, at *10, *18 (D. Minn. July 27, 2026). Congress's choice to give "the CFTC exclusive jurisdiction to regulate many of Kalshi's sports-related swap contracts" "preempts the control defendants seek to exert over Kalshi." *Coinbase Fin. Mkts., Inc. v. Raoul*, No. 1:25-cv-15406, 2026 WL 2969682, at *18 (N.D. Ill. Oct. 2, 2026). These courts

[1] Compl., *United States v. Arizona*, No. 2:26-cv-2246 (D. Ariz. Apr. 2, 2026), Dkt. No. 1; Compl., *United States v. Connecticut*, No. 3:26-cv-498 (D. Conn. Apr. 2, 2026), Dkt. No. 1; Compl., *United States v. Illinois*, No. 1:26-cv-3659 (N.D. Ill. Apr. 2, 2026), Dkt. No. 1; Compl., *United States v. New York*, No. 1:26-cv-3404 (S.D.N.Y. Apr. 24, 2026), Dkt. No. 1; Compl., *United States v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026), Dkt. No. 1; Compl., *United States v. Minnesota*, No. 0:26-cv-2661 (D. Minn. May 19, 2026), Dkt. No. 1; Compl., *United States v. New Mexico*, No. 1:26-cv-1912 (D.N.M. June 12, 2026), Dkt. No. 1; Compl., *United States v. Kentucky*, No. 3:26-cv-49 (E.D. Ky. June 23, 2026), Dkt. No. 1; Intervenor Compl., *KalshiEX LLC v. Furcolo*, No. 1:26-cv-327 (D.R.I. June 26, 2026), Dkt. No. 37; Compl., *United States v. Utah*, No. 2:26-cv-1055 (D. Utah Oct. 26, 2026), Dkt. No. 1 (collectively, "CFTC Complaints").

further recognized that, absent preliminary relief, Kalshi would suffer irreparable harm from the Hobson's choice presented by state regulation—either shut down in violation of federal regulations, or continue operating under threat of state criminal and civil penalties. *E.g.*, *Flaherty*, 172 F.4th at 231-32. That is untenable. And the remaining factors favor relief where, as here, a plaintiff seeks to enjoin a "state law [that] is likely preempted." *Minnesota*, 2026 WL 2150211, at *17; *see Tex. Midstream Gas Servs., L.L.C. v. City of Grand Prairie*, 2008 WL 5000038, at *20 (N.D. Tex. Nov. 25, 2008), *aff'd*, 608 F.3d 200 (5th Cir. 2010).

Kalshi therefore respectfully requests that this Court issue a temporary restraining order and preliminary injunction enjoining Defendants from pursuing any state action against Kalshi and its affiliates concerning trading on Kalshi's DCM.

## BACKGROUND

### A. Event Contracts.

Derivatives are contracts that derive value from an underlying commodity. That commodity may be tangible, such as wheat or livestock, or intangible, such as an interest rate, a stock index, or (as relevant here) the occurrence of an event. *See* 7 U.S.C. §§ 1a(9), (19)(iv).

Congress has regulated commodity-derivative markets for over a century based on its recognition that those markets provide valuable means for hedging risk and "discovering prices." 7 U.S.C. § 5(a); *see* Grain Futures Act, Pub. L. No. 67-331, § 3, 42 Stat. 998, 999 (1922). Consider an example involving a swap—a derivative contract where parties exchange two different cash flows and settle them at a given time. 7 U.S.C. § 1a(47)(A)(iii). In the early 2000s, Southwest Airlines entered into swaps that exchanged payments tied to the volatile spot price of jet fuel for payments at a fixed price.[2] Those trades protected the airline against a spike in the spot market,

[2] *See* Robert Brooks, *A Life Cycle View of Enterprise Risk Management: The Case of Southwest Airlines Jet Fuel Hedging*, 38 J. Fin. Educ. 33, 33-34 (2012).

and the prices at which the swaps traded told the market what jet fuel was expected to cost.

In the early 1990s, institutions began trading a new type of derivative, known as an event contract, to more precisely hedge the risk associated with future occurrences. *See* Concept Release, 73 Fed. Reg. 25,669, 25,671-72 (May 7, 2008). Event contracts work by trading binary positions about whether an event will occur. Contracts have a "yes" and a "no" position, each valued at a price reflecting the market's assessment of the event's likelihood. *See* Frank N. Fisanich, Prediction Markets Advisory, CFTCLTR No. 26-08, 2026 WL 734345, at *1 (Mar. 12, 2026). Consider a contract asking whether it will rain in the Coachella Valley on a given day. It pays $1 if it rains and nothing if it does not. A festival promoter worried that rain will depress ticket sales can buy "yes" positions to hedge against lost revenue. And the contract's trading price tells the public how likely the market thinks rain is.

Event contracts have grown popular in recent years, but they are not new. In 1993, the CFTC allowed an exchange to list event contracts tied to election results. Andrea M. Corcoran, CFTC No-Action Letter, CFTCLTR No. 93-66, 1993 WL 595741, at *1 (June 18, 1993). In 1999, it permitted exchanges to list event contracts on weather. Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806, 35,812 & n.75 (June 12, 2026). In 2004, the CFTC designated an exchange devoted entirely to event contracts. Event Contracts, 89 Fed. Reg. 48,968, 48,969 & n.12 (June 10, 2024). In 2008, the CFTC issued a concept release on how best to regulate this growing market, recognizing event contracts may be based on "eventualities … as varied as the world's population" and "the outcome of particular entertainment events." 73 Fed. Reg. at 25,669. And in 2010, the CFTC permitted a DCM to list event contracts related to movie box office revenues. 91 Fed. Reg. at 35,814.

Plaintiff Kalshi operates a federally licensed derivatives exchange. *KalshiEX LLC v.*

*CFTC*, No. 23-3257, 2024 WL 4164694, at *4 (D.D.C. Sep. 12, 2024). Kalshi has offered event contracts on its exchange since 2021 and today lists an array of contracts on economics, finance, health, cryptocurrencies, popular culture, and politics, which businesses use for both informational and hedging purposes every day. Declaration of Xavier Sottile ("Sottile Decl.") ¶¶ 5-6. For instance, users visit Kalshi to see up-to-the-minute predictions about the likelihood of events from election results (where Kalshi's contracts have proven more accurate than polling[3]), to economic policy decisions (where Kalshi's contracts have provided a valuable benchmark to "policymakers" and "forecasters" at the Federal Reserve and beyond[4]). And businesses have used Kalshi's event contracts to hedge everything from labor costs,[5] to shipping rates,[6] to input prices.[7]

Event contracts serve these functions because they share the same "essential structural characteristics" of all derivatives. *See* Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65,969, 65,973 (Oct. 19, 2026). That is, they are traded on an exchange, at "market-set prices" controlled by the dynamic interaction of buyers and sellers, and in transactions centrally cleared by "registered clearinghouses." *Id.* at 65,973-74. As in any market, event-contract markets also attract speculators that serve to supply liquidity and stand ready to "assume[ ] the risks" that a "hedger seeks to avoid." *Leist v. Simplot*, 638 F.2d 283, 305-07 (2d Cir. 1980) (Friendly, J.) (citation omitted).

---

[3] Michael J. de la Merced, *Political Betting Markets See Vindication in Trump Victory*, N.Y. Times (Nov. 6, 2024), https://perma.cc/4N9Y-KLQN; Stuart A Thompson, *How Accurate Were Prediction Markets at Picking Midterm Winners?*, N.Y. Times (Nov. 6, 2026), https://perma.cc/W3MQ-FXG6.

[4] Anthony M. Diercks et al., *Kalshi and the Rise of Macro Markets* 1, 4, Fed. Rsrv. Bd. Fin. & Econ. Discussion Series No. 2026-010 (Feb. 2026), https://perma.cc/9EY4-M3HY.

[5] Suzanne McGee, *Prediction markets take swing at hedging for US small businesses*, Reuters (Aug. 28, 2026), https://perma.cc/UFA5-DFCG; *Goat herding hedge: How Susquehanna and Kalshi are helping this company offset a change in California law*, CNBC (Aug. 13, 2026), https://perma.cc/49ZG-WA9B (California goat-herding company hedging the risk of higher wages after a change in state law).

[6] Richard Sine, *Prediction markets gain role in risk transfer*, Bus. Ins. (Oct. 26, 2026), https://perma.cc/E4G2-Q6KL.

[7] Grace Asenov, *First Tungsten Hedge Trades on Prediction Market Kalshi*, Bloomberg (Oct. 22, 2026), https://perma.cc/9PU4-MXZZ.

In the early 2020s, exchanges realized there was a major asset class that could benefit from event-contract trading: sports. Today, the global sports market is "expected to grow 44% from 2025 to reach $602 billion by 2030."[8] As the investment firm Apollo explained in a recent white paper, sports are associated with numerous value streams, from team valuations, to "media contracts, sponsorship and licensing," "merchandise" deals, and "entertainment,"[9] all of which are driven by sporting contests themselves. Kalshi self-certified its first sports-event contract in January 2025, and the CFTC has since allowed thousands of sports-event contracts to be listed, traded, and closed. Sottile Decl. ¶¶ 7, 11. As with Kalshi's other event contracts, businesses use Kalshi's sports-event contracts to hedge everything from "performance incentives in athletes' and coaches' contracts,"[10] to the cost of local promotions,[11] to low foot traffic near a stadium.[12]

Sports-event contracts are structurally identical to other derivatives, and fundamentally different from bets offered by state-regulated sportsbooks. Sportsbooks are bookmakers, which means they are counterparties to bets placed by customers. Sportsbooks set the odds of each bet and win when bettors lose; as a natural consequence, they block or limit skilled bettors, and they encourage unskilled bettors. *See* 91 Fed. Reg. at 65,973-75. Kalshi, by contrast, is a CFTC-regulated exchange. The market—not Kalshi—sets prices. Like other regulated financial exchanges, Kalshi primarily makes money through trading fees, and Kalshi does not win when traders lose; it therefore has no incentive to exclude winners—just the opposite. These distinctions

[8] Goldman Sachs Private Wealth Mgmt., *Playing for Scale: The Future of Sports Investing* (Oct. 28, 2026), https://perma.cc/XY98-FWKS.
[9] Al Tylis et al., *The Financing Gap in Sports: Unlocking a $2.5 Trillion Opportunity* 6, Apollo (Dec. 2025), https://perma.cc/483U-HSQW.
[10] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times: DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5.
[11] Anna Spiegel, *Exclusive: This D.C. bar will pay your tab if Team USA wins a World Cup game*, Axios D.C. (June 17, 2026), https://perma.cc/9UU4-H679.
[12] Sasha Rogelberg, *Prediction markets are now 'bespoke insurance' for businesses, and a Los Angeles restaurant group's $60,000 hedge on Kalshi is the latest example*, Fortune (Oct. 19, 2026), https://perma.cc/X49M-US5U.

are distilled in the following chart, reproduced from the popular website Investopedia.[13]

| **Prediction Markets vs. Sportsbooks** | | |
|---|---|---|
| **Feature** | **Prediction Markets** | **Sportsbooks** |
| Who you trade or bet against | Market participants | The sportsbook |
| Who sets prices | Buyers and sellers through market trading | The sportsbook, based on market information |
| Price format | Contract prices, usually in cents, reflecting implied probabilities | American, decimal, or fractional odds |
| How it makes money | Primarily trading fees; market makers may earn bid-ask spreads | Primarily margins built into betting odds (vig) |
| Typical costs | Trading fees and spreads vary by platform, contract, and liquidity | Vig varies by bet type; approximately 4.5% theoretical hold on standard -110/-110 bets |
| Events covered | Sports, politics, economics, and other events | Primarily sports |
| U.S. regulation | CFTC for federally registered exchanges; jurisdiction over sports contracts is disputed | State gaming regulators |
| Can you exit early? | Yes, if trading remains open and there is sufficient liquidity | Sometimes, through sportsbook cash-out offers |

## B. Statutory and Regulatory Background.

Event contracts have long been subject to the "comprehensive regulatory structure" for derivatives trading set out in the CEA. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982) (citation omitted). That structure was always designed to cover emerging derivative instruments like event contracts. *See* 7 U.S.C. §§ 1a(9), (47)(A)(iv) (defining "commodity" and "swap" to include instruments that develop "in the future"). And Congress took two successive actions with respect to event contracts specifically. First, in 2000, after event

[13] Nick Gallo & Vikki Velasquez, *Understanding Prediction Markets Before You Trade*, Investopedia (Oct. 20, 2026), https://perma.cc/58ZR-KANQ.

contracts had gained in popularity, Congress specifically defined covered "commodities" to include an "occurrence" or the "extent" of such an occurrence, thus squarely putting event contracts within the scope of the CEA. *Id.* § 1a(19)(iv). Second, in 2010, Congress went further and defined event contracts as a kind of "swap"—specifically a contract "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii).

Congress also addressed specific types of event contracts in a provision known as the "Special Rule." 7 U.S.C. § 7a-2(c)(5)(C). The Special Rule identifies categories of event contracts that Congress singled out for heightened scrutiny, including contracts that "involve" "gaming," *id.* § 7a-2(c)(5)(C)(i)(V), which sponsors suggested would cover contracts "around sporting events such as the Super Bowl … [or the] Masters Golf Tournament," 156 Cong. Rec. S5906-07 (daily ed. July 15, 2010) (statement of Sen. Lincoln). Congress did not prohibit such contracts; instead, it authorized the CFTC to prohibit them, but only if the agency determines they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(ii). And in June 2026, the CFTC published a Notice of Proposed Rulemaking ("NPRM") setting out a comprehensive framework for regulating event contracts under the Special Rule. *See* 91 Fed. Reg. at 35,806. The NPRM again confirms that the CEA "expressly preempts state laws" with respect to event contracts on DCMs. *Id.* at 35,808. It recognizes event contracts as "swaps" that serve "price discovery" and hedging functions. *Id.* at 35,807-08. And it proposes revising CFTC regulations to clarify that event contracts may involve sports events and that many (but not all) such contracts "can be operated consistent with the public interest." *Id.* at 35,818, 35,835-36, 35,853.

When swaps, including event contracts, are "traded or executed" on a DCM, the CFTC has "exclusive jurisdiction" over them. 7 U.S.C. § 2(a)(1)(A). Congress created the CFTC and

granted it that authority in 1974 after decades of experimentation with concurrent regulation in which states invoked their gambling laws to regulate, and sometimes ban, derivatives trading.[14]

When derivatives trading first emerged in this country, many states met it with antipathy, prohibiting it entirely as "gambling in grain." *E.g.*, *Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888); *id.* at 648 ("This species of gambling has become emphatically and pre-eminently the national sin."). States enacted "anti-gaming" laws to make it "as difficult as humanly possible to trade" those instruments. John H. Stassen, *The Commodity Exchange Act in Perspective*, 39 Wash. & Lee L. Rev. 825, 826 (1982). As exchange trading grew, early courts "frowned upon" futures contracts as equivalent to "gambling contracts." *Nairn v. J.A. Acosta & Co. (In re Rosenbaum Grain Corp.)*, 103 F.2d 656, 659 (7th Cir. 1939). Even the Supreme Court held that where the parties intend that the "purchaser shall merely receive or pay the difference between the contract and the market price, the transaction is a wager, and nothing more." *Irwin v. Williar*, 110 U.S. 499, 508 (1884); *see Embrey v. Jemison*, 131 U.S. 336, 345-46 (1889); *Pearce v. Rice*, 142 U.S. 28, 40 (1891); *Clews v. Jamieson*, 182 U.S. 461, 489-90 (1901).

Congress found the resulting "chaos" untenable. *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agric. & Forestry*, 93d Cong. 685 (1974) ("Senate Hearings") (statement of Sen. Clark). Because a national derivatives market could not function under 50 different state regimes, Congress acted to "[b]ring[ ] all futures trading under federal regulation" and a single national regulator. H.R. Rep. No. 93-975, at 54 (1974).

Congress paired that exclusive jurisdiction with broad regulatory authority. It directed the CFTC to promulgate regulations "necessary to effectuate" 23 core principles that every DCM must satisfy, 7 U.S.C. § 12a(5), including "access requirements," *id.* § 7(d)(2)(A)(i), preventing

[14] *E.g.*, 1915 Ala. Laws 914; 1962 S.C. Acts 1228-29; 1925 N.Y. Laws 547; 1968 Ga. Laws 1319.

"manipulation," *id.* § 7(d)(3), recordkeeping requirements, capital-reserve requirements, and a requirement to clear all trades through a CFTC-regulated clearinghouse, *id.* §§ 7(d)(11), (18), (21); *id.* § 7a-1. The CFTC has implemented each principle through detailed regulations, *see* 17 C.F.R. pt. 38. And DCMs must "comply with" all of these requirements, 7 U.S.C. § 7(d)(1)(A), or face civil penalties, licensing revocation, and referral for criminal enforcement, *id.* §§ 8(b), 9(10)(C), 13. In addition to its forthcoming regulation governing the public-interest framework for sports-event contracts, the CFTC in October 2026 took two further steps under its express statutory authority to define "swap." *See* 15 U.S.C. § 8302(d)(1); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-95 (2024). *First*, on October 19, it issued an Interim Final Rule ("IFR"), "effective immediately," expressly excluding from the "swap" definition traditional casino-style or sportsbook wagering—that is, contracts "regulated as gaming or gambling under applicable State or Tribal law" and "not traded on a board of trade" or other "organized exchange." 91 Fed. Reg. at 65,977, 65,979. *Second*, the CFTC proposed defining "swap" to include "[e]vent contracts, including those based on sports-[related] . . . events." Further Definition of "Swap" – Inclusions, 91 Fed. Reg. 66,022, 66,033 (Oct. 19, 2026). The CFTC explained that, under "the best reading of the statute," such contracts already qualify as swaps, including because they are " commonly known to the trade as swaps," but that the CFTC's "exercise of its express statutory authority to 'further define' the term 'swap' provides an independent legal basis to deem these contracts as swaps." *Id.* at 66,025 (quoting 7 U.S.C. § 1a(47)(A)(iv)).

**C. This Litigation.**

Kalshi has offered event contracts since 2021 and began offering sports-event contracts in early 2025. Sottile Decl. ¶¶ 5, 7. Although the CFTC has approved these contracts for listing, some states have argued that event contracts, particularly those involving sports, violate state gaming laws. Louisiana is among those states, refusing to recognize that federal law displaces its

gambling and sports wagering regime as applied to trading on a federally regulated exchange.

On December 5, 2025, the Louisiana Gaming Control Board issued an advisory notice declaring sports-event contracts "illegal gambling" under Louisiana law, "whether the contract is listed on an exchange regulated by the [CFTC] or elsewhere," and stating that it "sees no defense to offering such activity pursuant to a CFTC license." Porter Decl., Ex. 1 at 2. The Board sent the notice to the State Police's Gaming Enforcement Division and the Attorney General's Gaming Division. *Id.*, Ex. 1 at 3. Chairman Hebert has since declared that the State is "actively seeking ways to stop this," *id.*, Ex. 2 at 5, and on August 1, 2026, the Attorney General gained sweeping new enforcement powers, La. Rev. Stat. §§ 27:19.1, 27:19.2.

Defendants' position is that Kalshi may operate in Louisiana "only if [it] possesses a sports wagering gaming license or permit." Porter Decl., Ex. 1 at 2. However, Louisiana imposes a host of requirements that a nationwide DCM cannot satisfy. Operators cannot accept "sports wager[s]" unless the individual placing it is physically located in a parish that has authorized sports wagering and is twenty-one years of age or older, among other requirements. La. Rev. Stat. § 27:608(A). Wagering is confined to events "authorized by law or the board," *id.* § 27:608(C)(1), and the Board may "restrict, limit, or exclude" categories of wagering, *id.* § 27:608(F). Wagers must be "initiated, received, and otherwise made within the state." *Id.* § 27:607(F). No wager may be placed "when the player is physically located out of state or in a parish that has not approved a proposition authorizing sports wagering." *Id.* § 27:609(C)(2)(b). And "[a]ll servers responsible for the processing of sports wagers shall be physically located in Louisiana." *Id.* § 27:605(G).

Louisiana backs its regime with stiff criminal and civil sanctions. These include fines of up to $100,000 and up to five years' imprisonment per wager, *id.* §§ 14:90.3(E), (I); mandatory forfeiture of profits and gross receipts, *id.* § 14:90.3(J); and civil forfeiture "notwithstanding

whether a conviction has been procured," *id.* § 14:90.1(B)(1). The Attorney General may also seek injunctions and *ex parte* orders removing websites and freezing bank accounts, "regardless of whether proceedings have been initiated." *Id.* §§ 27:19.1, 27:19.2(A)–(B).

After Kalshi filed its Complaint on October 23, 2026, its representatives contacted representatives of the State of Louisiana in an effort to reach an agreement that would obviate the need for emergency or preliminary relief. Porter Decl. ¶ 4. Kalshi believes the State will imminently initiate an action against Kalshi in state court to restrict it from operating in Louisiana. Porter Decl. ¶ 5.

## ARGUMENT

As the Third Circuit and multiple district courts have held, Kalshi is entitled to emergency and preliminary injunctive relief preventing state officials from enforcing state gambling laws against event contracts traded on Kalshi's federally regulated DCM. To obtain such relief, the moving party must demonstrate: (1) it is likely to succeed on the merits; (2) it faces a threat of irreparable harm absent relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Space Expl. Tech. Corp. v. NLRB*, 151 F.4th 761, 772 (5th Cir. 2025). The same factors govern Kalshi's request for a temporary restraining order. *Xue v. Bowen*, No. 26-1958, 2026 WL 1683137, at *1 n. 1 (W.D. La. June 10, 2026). Kalshi readily satisfies this standard.

### A. Kalshi Is Likely to Succeed on the Merits.

A "fundamental principle of the Constitution" is that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Federal law can preempt state law expressly in the statutory text, occupy an entire field of regulation to the exclusion of state law, *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152-53 (1982), and, independently, displace state laws that conflict with a federal regulatory regime, *Hines v.*

*Davidowitz*, 312 U.S. 52, 67 (1941). The CEA makes clear that Louisiana's gambling laws are preempted under any and all of those theories: It grants the CFTC "exclusive jurisdiction" over trading on DCMs, 7 U.S.C. § 2(a)(1)(A), and Kalshi's sports-event contracts fall squarely within that provision's preemptive scope. Accordingly, Kalshi is likely to succeed on the merits.

1. <u>The CEA's Grant of "Exclusive Jurisdiction" to the CFTC Preempts Louisiana's Gambling Laws as to Event Contracts Traded on DCMs.</u>

*a. The CEA expressly preempts state law.* Section 2(a)(1)(A) grants the CFTC "exclusive jurisdiction" "with respect to accounts, agreements …, and transactions involving swaps or contracts of sale of a commodity for future delivery" so long as those instruments are "traded ... on a contract market designated pursuant" to the CEA. The "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to other entities. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992); *see Exclusive*, American Heritage Dictionary (5th ed. 2022) ("Not … shared with others"; "sole"; "incompatible"). The CEA's plain text thus "excludes all others," including state regulators. *Assad*, 190 F.4th at 1110.

Statutory history powerfully confirms that reading. Before 1974, the CEA contained a provision ensuring that it did not "impair any State law" applicable to certain CEA-covered "transaction[s]." Commodity Exchange Act, Pub. L. No. 74-675, § 5, 49 Stat. 1491, 1494 (1936). On the same day in 1947, the Supreme Court decided two cases that turned on precisely this distinction. In *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947), the Court held that the United States Warehouse Act preempted state regulation because Congress had made federal authority "exclusive." *Id.* at 233-34. But in *Rice v. Board of Trade of Chicago*, 331 U.S. 247 (1947), the Court held that the pre-1974 CEA did *not* preempt state law, based both on the savings clause and the lack of a "declaration" that the CEA was "exclusive of state regulation." *Id.* at 253.

In 1974, Congress set out "to assure that Federal preemption [was] complete." 120 Cong.

Rec. 30,464 (1974) (statement of Sen. Curtis). It did so by adopting the formula the Supreme Court said would suffice: It added the "exclusive jurisdiction" provision—which *Board of Trade* deemed missing—and removed the state-law savings clause—which *Board of Trade* held was a bar to preemption. 7 U.S.C. § 2(a)(1)(A); *see Bd. of Trade*, 331 U.S. at 253. The changes were designed "wholly and unequivocally" to displace state regulation. Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692-93 (1982).

A mountain of precedent confirms that reading. The Supreme Court and the Fifth Circuit have repeatedly reaffirmed that a grant of "exclusive jurisdiction" to a federal agency preempts state efforts to intrude on the same "regulatory turf." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016); *see N. Nat. Gas Co. v. State Corp. Comm'n of Kan.*, 372 U.S. 84, 92 (1963); *Friberg v. Kan. City S. Ry. Co.*, 267 F.3d 439, 443-44 (5th Cir. 2001) (statutory grant of "exclusive" jurisdiction expressly preempted state law); *Point Landing, Inc. v. Omni Cap. Int'l, Ltd.*, 795 F.2d 415, 420-22 (5th Cir. 1986) (the CEA preempted private rights of action under securities laws because "[a]ny other result would frustrate the intent of Congress to preempt the field insofar as futures regulation is concerned"), *aff'd sub nom. Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987). And in the face of an "express pre-emption clause," there is no "presumption against pre-emption." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016); *see Minnesota*, 2026 WL 2150211, at *10; *Raoul*, 2026 WL 2969682, at *9-10.

With respect to the CEA, specifically, nearly every court to consider the question has easily concluded that the exclusive-jurisdiction provision preempts state law with respect to instruments traded on DCMs. Most important, the Fifth Circuit has rejected the claim that commodity futures trading constitutes unlawful "commercial gambling" under state law. *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam). Other

courts agree. *See Leist*, 638 F.2d at 322 (the CEA "preempts the application of state law"); *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989) (where "the CFTC has jurisdiction, its power is exclusive"); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) ("Congress intended the CFTC to occupy the entire field of commodities futures regulation[.]"); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992) (state-law claims "are preempted by the CEA" as applied to contract markets). The Third and Ninth Circuits recently reached the same conclusion. *Flaherty*, 172 F.4th at 229 (the CEA "preempts state law purporting to regulate futures trading"); *Assad*, 190 F.4th at 1110 ("[B]ased on its plain wording, § 2 preempts state regulation of swaps that are 'traded or executed' on a DCM.").[15]

Other features of the CEA's text reinforce preemption, too. Section 2(a)(1)(A)'s savings clause provides that Section 2 does not "supersede" the "jurisdiction" of "other regulatory authorities" under state laws "[e]xcept as hereinabove provided" by the grant of "exclusive jurisdiction" to the CFTC, 7 U.S.C. § 2(a)(1)(A)—making clear that the jurisdiction earlier provided was "intended to have preemptive effect," *Assad*, 190 F.4th at 1110. In other words, the CFTC's exclusive jurisdiction under Section 2(a)(1)(A) "supersede[s]" and "limit[s] the jurisdiction … conferred on … regulatory authorities under the laws … of any state," and thus "restrict[s]" state authorities from enforcing contrary law. 7 U.S.C. § 2(a)(1)(A).

Congress reinforced that limitation yet again in Section 16(e)(1) when it clarified that the CEA would not "preempt" state law as to transactions "not conducted on" a DCM. *Id.* § 16(e)(1)(B)(i). The obvious natural inference is that Section 2(a)(1) *does* have that preemptive

[15] The Sixth Circuit reached a different conclusion. *KalshiEX LLC v. Schuler*, --- F.4th ----, No. 26-3196, 2026 WL 2884087, at *22-28 (6th Cir. Sep. 25, 2026). But that result is clearly wrong given the statute's text and the mountain of precedent recognizing the exclusive-jurisdiction provision's preemptive effect. And the panel decision is currently under review, as Kalshi has filed a petition for rehearing and rehearing *en banc*. Pet. for Reh'g and Reh'g En Banc, *KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir. Oct. 9, 2026), Dkt. No. 92.

effect as to transactions that *are* conducted on a DCM. And when Congress determined that certain specific transactions need not occur on DCMs yet should still be insulated from state regulation, it enacted parallel provisions preempting state "gaming" laws. *Id.* § 16(e)(2). Those reticulated provisions would make no sense if states had the carte-blanche authority to apply their gaming laws to DCM trading. *See Flaherty*, 172 F.4th at 229.[16]

The CFTC agrees—and has for decades and across Administrations. As early as 1978, the Commission recognized that Congress "consciously wished to avoid duplicative jurisdiction … by 50 States." *Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agric.*, 95th Cong. 35 (1978) (statement of then-CFTC Chair Bagley). The CFTC has reiterated that position many times, including in the 2008 concept release, where it explained that the CEA "supersedes and preempts other laws, including state and local gaming and bucket shop laws, with respect to transactions executed on or subject to the rules of a Commission-regulated market." 73 Fed. Reg. at 25,673; *see also* 89 Fed. Reg. at 48,977 n.84 (the CFTC's "exclusive jurisdiction" over event contracts "preempt[s] the application of state law"). It informed the D.C. Circuit in 2024 that, "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Appellant Br. at 27, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Cir. Oct. 16, 2024), 2024 WL 4512583. And in the past year, the agency has initiated or intervened in litigation against ten other states to prevent them from applying state gambling laws to event contracts traded on CFTC-regulated DCMs. *See* CFTC Complaints. The agency's long-held position constitutes an "informed" and "experience[d]" judgment and therefore supports preemption. *See Loper Bright*, 603 U.S. at 388 (citation omitted).

---

[16] In fact, the one time in recent memory Congress spoke to unlawful internet "gambling," it specifically defined the term "bet or wager" to *exclude* transactions conducted on "a registered entity ... under the Commodity Exchange Act." 31 U.S.C. § 5362(1)(E)(ii).

*b. The CEA preempts the field of regulated trading on DCMs.* The exclusive-jurisdiction provision and the "comprehensive regulatory structure" surrounding it, *Curran*, 456 U.S. at 356 (citation omitted), separately demonstrate that Congress intended to foreclose state regulation of trading on DCMs. *See Crosby*, 530 U.S. at 372 n.6 ("[T]he categories of preemption are not 'rigidly distinct,' " and field preemption can be "express" (citation omitted)). As explained, DCMs may operate only after federal designation and remain subject to comprehensive CFTC oversight of everything from the contracts they list, to how they clear the trades they conduct, to the access they must provide to users. 7 U.S.C. §§ 7(d)(2)(A)(i), (d)(11). That pervasive federal scheme leaves no room for states to separately regulate instruments traded on DCMs. *See Santa Fe Elevator*, 331 U.S. at 233-34 (construing a similar grant of "exclusive" jurisdiction to preempt the field). Louisiana's attempt at "regulation of trading on a DCM" is thus preempted on that basis, too. *Flaherty*, 172 F.4th at 229; *see Minnesota*, 2026 WL 2150211, at *14.

*c. Louisiana's threatened enforcement conflicts with federal law.* As multiple federal courts have held regarding similar laws, the conflict between Louisiana's gambling laws and the CEA further reinforces preemption. *See*, *e.g.*, *Flaherty*, 172 F.4th at 229-30; *Raoul*, 2026 WL 2969682, at *14-15. It would be "impossible" for Kalshi "to comply with both state and federal law," and Louisiana's law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA. *Crosby*, 530 U.S. at 372-73 (citation modified); *see also Arizona v. United States*, 567 U.S. 387, 399 (2012) (same).

*First*, "a contract market could not operate efficiently, and perhaps not at all" under "varying and potentially contradictory legal standards." *Am. Agric.*, 977 F.2d at 1156; *see also id.* (noting Congress's intent to bring futures markets "under a uniform set of regulations"). Allowing Louisiana "to enforce its gambling laws" against Kalshi would "create an obstacle to" Congress's

objectives by reviving "exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230; *see also Arizona*, 567 U.S. at 410 (holding state law preempted because, by "authorizing state and local officers to engage in these enforcement activities as a general matter," it "create[d] an obstacle to the full purposes and objectives of Congress").

*Second*, it would be impossible for a DCM to comply with Louisiana's requirements without violating federal law. Under the CEA, DCMs are required to adhere to CFTC regulations, including a requirement to "provide … impartial access to its markets and services." 17 C.F.R. § 38.151(b). On November 5, 2026, the CFTC issued guidance related to the impartial-access requirement, formalizing its long-held view that impartial access means that a DCM must offer its products in all 50 states, explaining that "[d]erivatives markets must operate on a uniform basis at a national scale in order to achieve the CEA's purpose" of " 'provid[ing] a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities.' " Christopher J. Kirkpatrick, *DCM Impartial Access Requirements* 4, CFTC (Nov. 5, 2026), https://perma.cc/3SJ7-Y47P ("*Impartial Access Guidance*") (quoting 7 U.S.C. § 5(a)). In other words, the impartial-access regulation demands that users *nationwide* receive the same access to DCMs, meaning that compliance with state-by-state restrictions is "impossible." Amicus Br. of CFTC at 23-24, *KalshiEX LLC v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026), Dkt. No. 31. The Commission has explained that "[w]hen a DCM restricts access based on domestic geographic location—permitting participants from one region or State within the United States while barring those from another—it excludes otherwise eligible individuals," which "undermine[s] the principle of impartial access." *Impartial Access Guidance* at 5. "[G]eographic access restrictions," the Commission concluded, "are inconsistent with the CEA and Commission rules and regulations." *Id.* at 6. The guidance

specifically identifies sports-related contracts as an example: Where such contracts "attract disproportionately regional interest (e.g., whether a home team advances to its playoffs), excluding such regions could decrease the contracts' overall liquidity." *Id.* at 5.

Louisiana's framework is no exception: trades must be "initiated, received, and otherwise made within the state unless otherwise determined by the board," La. Rev. Stat. § 27:607(F); no trades may be placed by an individual who is "physically located out of state or in a parish that has not approved a proposition authorizing sports wagering," *id.* § 27:609(C)(2)(b); and "[a]ll servers responsible for the processing of sports wagers" must be "physically located in Louisiana," *id.* § 27:605(G). Those restrictions are inherently incompatible with an exchange required to operate nationally and impartially, and restrictions of this nature have already placed Kalshi in potential jeopardy with both state and federal regulators. When a state court ordered Kalshi to unwind trades involving traders in that state—relief Louisiana may seek in its imminent threatened enforcement action—the CFTC ordered Kalshi "to fulfill the trades in question in accordance with its normal practices," notwithstanding the state-court order.[17] The CFTC warned that the CEA "neither contemplates nor permits a state of affairs in which particular subsets of executed CFTC-regulated derivatives transactions are subject to unwinding on the whim of a state court,"[18] and that the resulting price distortions would "violate CEA Core Principle 4, which requires DCMs to prevent manipulation, price distortion, and disruption of the cash settlement process."[19] And in connection with a threatened temporary restraining order in another state court, which, if entered, would purport to prohibit Kalshi from offering event contracts from or in the State of New York, the CFTC directed Kalshi not to comply with any such order, stating that its compliance would risk

[17] Christopher J. Kirkpatrick, *Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents* 1, CFTC (July 14, 2026), https://perma.cc/GV5X-M9PQ.
[18] *Id.* at 7.
[19] *Id.* at 8.

Kalshi's ability to "comply with Core Principles 2, 4, 6, 7, 9, 11, 12, and 21."[20]

*Third*, Louisiana's attempt at regulation is irreconcilable with the discretion Congress gave to the CFTC to approve transactions on Kalshi's licensed DCM. Here, Louisiana law threatens to impose criminal penalties against Kalshi for offering sports-event contracts on its nationwide exchange even though the CFTC, the agency entrusted with discretion over such contracts, *see* 7 U.S.C. § 7a-2(c)(5)(C), has found those contracts lawful. Allowing Louisiana to impose its own judgment would nullify the CFTC's public-interest exception. *See Crosby*, 530 U.S. at 380.

If Louisiana can regulate all sports-event-contract trading as "gambling," there is no logical reason it could not also regulate all derivatives as gambling. Louisiana law makes it a crime to conduct, as a business, any "game, contest, … or contrivance whereby a person risks the loss of anything of value in order to realize a profit," La. Rev. Stat. § 14:90, which would sweep in any futures contract or swap. That is exactly the "total chaos" Congress enacted the CEA and preempted state law to avoid, Senate Hearings at 685, and it provides every reason to displace state law.

2. <u>Kalshi's Event Contracts Fall Within the CFTC's Exclusive Jurisdiction.</u>

The plain text of the CEA defines "swap" to include event contracts—that is, contracts "dependent on the occurrence … of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). This definition includes Kalshi's sports-event contracts, which provide for a payment that is "dependent on the occurrence" of a sports "event." *Id.* These underlying events also have "potential financial … consequence[s]." *Id.* Sports events "generate economic activity and materially affect both regional and national markets" with "billions" of dollars at stake. 91 Fed. Reg. at 35,807-08, 35,830 (citation modified).

[20] Christopher J. Kirkpatrick, *Order Directing Kalshi to Continue Exercising DCM Functions* 1, CFTC (Aug. 11, 2026), https://perma.cc/6KYE-MPKQ.

Examples abound, from the 2026 World Cup's "$17 billion boost in U.S. GDP,"[21] to the millions each Knicks playoff game generated for New York City businesses,[22] to performance bonuses,[23] and foot traffic.[24] It is thus no surprise that DCMs are used to hedge financial risk related to sports events.[25] These *direct* and *substantial* financial consequences easily establish that sports events are "associated" with "potential" consequences, 7 U.S.C. § 1a(47)(A)(ii), and that Kalshi's sports-event contracts qualify as "swaps." Conversely, while Louisiana claims the right to regulate *all* event contracts involving sports, it cannot plausibly prevail in showing that *no* sports event is associated with potential economic consequences.

The Special Rule removes any doubt about that conclusion. It expressly contemplates that "event contracts" designed as "swaps" may involve "gaming." *Id.* § 7a-2(c)(5)(C). And Congress was aware at the time that contracts involving "gaming" could include contracts on events like the "Super Bowl" and "Masters Golf Tournament." 156 Cong. Rec. S5907 (statement of Sen. Lincoln). Congress authorized the CFTC alone to determine whether to approve or prohibit those contracts, 7 U.S.C. § 7a-2(c)(5)(C)(i), and the agency has consistently permitted Kalshi to list sports-event contracts for trading. *Supra*, at 6.

As the CFTC reiterated in a recent regulation, none of this means that ordinary sportsbooks are "swaps" outside of the reach of state regulation. 91 Fed. Reg. at 65,972-73. Event-contract swaps have distinctive structural features, which further the hedging and price-discovery functions core to the CEA. 7 U.S.C. § 5(a). They are traded on an open exchange, at prices set by market

[21] Dylan Duke, *How much of an economic boom is the 2026 FIFA World Cup for the U.S. hosting cities?*, NPR (June 15, 2026), https://perma.cc/F64B-G5F4.
[22] Paul Mueller, *The Knicks playoff run is a billion-dollar slam dunk for New York*, Fast Co. (June 5, 2026), https://perma.cc/L4YX-7MGD.
[23] Sorkin, *supra* n.10.
[24] Rogelberg, *supra* n.12.
[25] Liz Hoffman, *Hedging a $15,000 New York Knicks bar tab on Kalshi*, Yahoo! Fin. (June 2, 2026), https://perma.cc/DFK9-GFM7.

forces, and are novated to neutral clearinghouses. 91 Fed. Reg. at 65,972-74. Ordinary sports bets differ "in all … respects"—they are bilateral transactions, with odds set by the house, in transactions designed for consumers to lose—and are therefore not "swaps." *Id.* at 65,973-74.[26] Ordinary sports bets are not used for economic hedging and do not advance price discovery functions and therefore do not fall within the scope of the CEA. The upshot is a clean, sensible line: States retain full authority over sportsbooks, *see* 7 U.S.C. § 16(e)(1)(B)(i), but on-DCM swap trading is the "exclusive" province of the CFTC.

Kalshi's contracts are also subject to CEA preemption for three independent reasons. *First*, Congress separately defined "swap" to include any contract that becomes "commonly known to the trade as a swap" "in the future." 7 U.S.C. § 1a(47)(A)(iv). As the CFTC recently explained, "event contracts are known to the trade as 'swaps,'" 91 Fed. Reg. at 65,974—indeed, sports-event contracts are so commonplace in the financial ecosystem that they are offered by both newcomers and established incumbents like CME.[27] *Second*, Kalshi's event contracts qualify as futures contracts and would be subject to the CFTC's exclusive jurisdiction even if they are not "swaps." *See* 91 Fed. Reg. at 35,809. *Third*, in any event, the language of the exclusive-jurisdiction provision covers *all* "agreements … traded or executed on a [DCM]." 7 U.S.C. § 2(a)(1)(A).

Finally, if a state believes the CFTC is improperly enforcing (or failing to enforce) the CEA, including by allowing instruments to be listed and traded as swaps improperly, it may bring suit under the APA, *see* 5 U.S.C. § 551(13) ("agency action" includes "failure to act"), or take the matter up with the CFTC in the pending rulemaking. But the CEA does not permit 50 different

---

[26] The Sixth and Ninth Circuits recently reached a different conclusion. *Schuler*, 2026 WL 2884087, at *14-15; *Assad*, 190 F.4th at 1113-16. But for all these reasons, those decisions are wrong. And, importantly, both decisions were issued before the CFTC's recent Interim Final Rule—which the Sixth Circuit is contemplating via Kalshi's pending petition for rehearing. *See supra* n.16.

[27] *CME Group partners with FutureSports to introduce world's first futures on sports indexes*, CME Grp. (July 29, 2026), https://perma.cc/XJ7L-HKKA.

states to collaterally attack the CFTC's conclusion that particular contracts qualify as swaps by bringing civil or criminal actions against DCMs for doing precisely what the CFTC has permitted.

**B. Kalshi Will Suffer Irreparable Harm Absent a TRO and Preliminary Injunction, and the Balance of Equities and Public Interest Favor Relief.**

Defendants' actions present Kalshi with a "Hobson's choice" giving rise to irreparable harm: either "continually violate [state] law and expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). As the Third Circuit has held, and as courts in this Circuit and elsewhere have since agreed, Kalshi and its users would suffer irreparable harm absent a TRO and injunction preventing state enforcement efforts. *See Flaherty*, 172 F.4th at 231-32; *see also Minnesota*, 2026 WL 2150211, at *16-17; *Raoul*, 2026 WL 2969682, at *16-17.

*First*, if Kalshi chooses to continue offering sports-event contracts without a state-issued license, Kalshi and its officers face the harms associated with potential criminal or civil enforcement. When brought under a preempted state statute, such enforcement actions constitute "irreparable injury." *Morales*, 504 U.S. at 382; *see Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *Minnesota*, 2026 WL 2150211, at *16 (finding likely harm "fairly obvious").

*Second*, compliance with preempted Louisiana law would subject Kalshi to the existential risk of losing its DCM designation. Abruptly terminating Kalshi's event-based contracts in Louisiana (as Kalshi might have to do if it complied with Defendants' demands), or imposing Louisiana-specific geography-based screening, would risk violating the CFTC Core Principles to which Kalshi is subject, including the obligation to provide "impartial access" to its markets, 17 C.F.R. § 38.151(b)—a regulation that, as the CFTC recently confirmed, is inconsistent with "geographic access restrictions," *Impartial Access Guidance* at 6; *see id.* at 4 (DCMs may not "limit access based on the location of an otherwise eligible market participant within the United

States"), and the obligation to reduce the risk of "market disruptions," 17 C.F.R. § 38.255; *see* Amicus Br. of CFTC at 26-27, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 (noting a DCM "cannot fulfill its federal mandate" if it complies with state-by-state regulation). The CFTC has the authority to respond to such violations with various sanctions, including revocation of Kalshi's DCM status. 7 U.S.C. § 8(b). And as discussed *supra* at 18-20, the CFTC has repeatedly and consistently warned that complying with restrictions like those demanded by Louisiana would violate federal law and regulations.

*Third*, Kalshi has over 200,000 verified users in Louisiana with millions of dollars in open contracts, many of which are related to sports and will fall within the conduct Defendants demand that Kalshi cease. Sottile Decl. ¶ 28. Compliance would require Kalshi to forgo a significant portion of this business, as it will be forced to either stop offering sports-event contracts in Louisiana or impose Louisiana-specific participation restrictions on its nationwide exchange. Because the Eleventh Amendment permits only *injunctive relief* against state officials enforcing unconstitutional state law, *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 507 (5th Cir. 2021), Kalshi would have no clear way of seeking damages if it ultimately prevailed. *See Polk v. Crawford*, 184 F.4th 715, 727-28 (5th Cir. 2026) (finding irreparable harm where an action to recover damages would be barred by sovereign immunity); *see also Minnesota*, 2026 WL 2150211, at *16 (finding irreparable harm where Kalshi could not recover compliance costs as damages).

*Fourth*, complying with Louisiana's laws would harm Kalshi's users. Compliance could require Kalshi to terminate contracts involving some users and liquidate their positions either at their original price or their most recent trading price. Sottile Decl. ¶¶ 31-35. Either scenario could result in substantial losses for users. *Id.* ¶¶ 36-42. And it would result in a loss of goodwill towards Kalshi that could not easily be regained even if Kalshi ultimately prevails—a distinct irreparable

harm. *See id.* ¶¶ 43-47; *Emerald City Mgmt., L.L.C. v. Kahn*, 624 F. App'x 223, 224-25 (5th Cir. 2015) (per curiam) (finding a "substantial threat of irreparable harm" from potential damage to "reputation and goodwill"); *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 313 (5th Cir. 2008) (per curiam) (similar). Courts have found the same harms sufficient in these very cases. *See Minnesota*, 2026 WL 2150211, at *17 (recognizing "irreparable injury" based on "reputational harm and damage to the goodwill that Kalshi … ha[s] fostered with users").

On the other hand, states have no legitimate interest in enforcing their preempted or otherwise invalid laws against Kalshi: "If the Act preempts [state] law, then the public interest is best served by enforcing the Act." *Flaherty*, 172 F.4th at 232. And where a state law is "likely preempted," the harm to the State from temporarily enjoining its enforcement is correspondingly "diminished." *Minnesota*, 2026 WL 2150211, at *17; *see also Raoul*, 2026 WL 2969682, at *18.

Further, the public interest here is substantial. Ceasing operations in Louisiana (or imposing Louisiana-specific restrictions on Kalshi's nationwide exchange) would distort the market and harm Kalshi's users and counterparties nationwide. Sottile Decl. ¶ 41. The CFTC has explained how location-based restrictions harm the broader market: Participants unable to manage their positions due to geographic restrictions may face forced liquidations that generate losses for futures commission merchants and clearing organizations, ultimately heightening systemic risk across financial markets, "fragment[ing] a national pool of liquidity," and "lead[ing] to wider bid-ask spreads, raising the cost of trading for all participants." *Impartial Access Guidance* at 5. The balance of the equities and public interest therefore firmly favor preliminary relief.

## CONCLUSION

For the foregoing reasons, and because Kalshi has no adequate remedy at law to address Louisiana's imminent unconstitutional conduct, the Court should issue a temporary restraining order and preliminary injunction.

Dated: November 12, 2026

KALSHIEX LLC,

By its Attorneys

*/s/ Andrew L. Porter*
Grant R. Mainland (*pro hac vice*)
Katherine Kelly Fell (*pro hac vice*)
Andrew L. Porter (*pro hac vice*)
Nicole D. Valente (*pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

Neal Katyal (*pro hac vice*)
Joshua B. Sterling (*pro hac vice*)
Colleen Roh Sinzdak (*pro hac vice*)
William E. Havemann (*pro hac vice*)
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

and

*/s/ Michael A. Balascio*
George C. Freeman, III, 14272
Michael A. Balascio, 33715
**BARRASSO USDIN KUPPERMAN**
**FREEMAN & SARVER, L.L.C.**
909 Poydras Street, Ste. 2350
New Orleans, LA 70112
Telephone: 504-589-9700
Facsimile: 504-589-9701
gfreeman@barrassousdin.com
mbalascio@barrassousdin.com

*Attorneys for Plaintiff KalshiEX LLC*